PERRY ZIMMERMAN, PETITIONER-APPELLANT, v. BOARD OF EDUCATION OF THE CITY OF NEWARK AND EDWARD F. KENNELLY, SUPERINTENDENT OF SCHOOLS, RESPONDENTS.

Argued April 23, 1962—Decided June 29, 1962.

Mr. *Seymour Margulies* argued the cause for petitioner-appellant (*Messrs. Levy, Lemken & Margulies,* attorneys).

Mr. *Jacob Fox* argued the cause for respondents.

The opinion of the court was delivered by

SCHETTINO, J.   Appellant, Zimmerman, seeks reinstatement as a teacher with tenure in the Newark school system. His case was originally reviewed in *Laba v. Newark Board of Education,* 23 *N. J.* 364 (1957).   But unlike the two other teachers involved in that case, Zimmerman had not achieved tenure status at the time he was dismissed, as of May 20, 1955.   He now argues primarily that we should order the Board to re-employ him even though his annual teaching contract expired on June 30, 1955 and was not renewed.   In his view he is entitled to tenure because continued employment would have taken place but for the fact that he invoked before a congressional subcommittee the protection afforded by the Fifth Amendment.   He further argues that he is now entitled to tenure because he was actually employed for three consecutive calendar years required by *N. J. S. A.* 18:13–16.   In the alternative he asserts that he was employed for three consecutive academic years and that the period of litigation following his third academic year should be considered as a recognition by the Board of his continued status as an employee

at the beginning of the required fourth academic year. The Board is estopped to deny this, he says, as it continued its investigation of him subsequent to his dismissal.

A brief summary of the events is as follows. Zimmerman and defendant Board of Education agreed by a writing on June 30, 1952, that he would begin teaching in the system on September 1, 1952. Similar agreements were made in the two succeeding years and he was considered a "satisfactory" teacher. On May 19, 1955, Zimmerman invoked the Fifth Amendment privilege against self-incrimination when he was called to testify before a subcommittee of the House Un-American Activities Committee in Newark. The questions he refused to answer were related to his Communist Party membership and association both past and present. After notice of suspension and based solely upon the charge that Zimmerman refused so to testify, the Board resolved on June 28, 1955 to dismiss him as of May 20, 1955. Zimmerman was successful in having that resolution reversed by this court in *Laba* but he was not granted reinstatement. Instead, our opinion in that case recognized that a person "who is now a member of the Communist Party or who is now subject to its ideologies" should be dismissed (23 *N. J.*, at *p.* 388) and that "the teachers' conduct before the Congressional subcommittee reasonably calls for a fitness inquiry during which the teachers have a duty of cooperation and an affirmative burden in the establishment of their fitness." 23 *N. J.*, at *p.* 392.

The defendant Superintendent of Schools interviewed Zimmerman on May 16, 1957. Counsel for Zimmerman was present but was limited to the role of providing advice to Zimmerman when asked. Based upon the testimony at this hearing the Superintendent filed a report with the Newark Board of Education along with seven "supplementary charges." Substantially for the reasons cited in the charges, the Superintendent recommended that Zimmerman "be not restored to his employment," but that if the Board were to reinstate Zimmerman until the end of the

1954-55 school year, the Superintendent recommended that Zimmerman should not be re-employed thereafter.

Board hearings on the charges were held in November and December 1957. Zimmerman's counsel was permitted to take part in the proceedings by examination and cross examination of witnesses. The Board, by resolution dated June 24, 1958, found him guilty of five of the supplemental charges and again dismissed him as of May 20, 1955. It expressly stated that it did not draw any inferences as to Zimmerman's then present membership or subservience to the Communist Party.

On appeal the State Commissioner of Education in part reversed the Board, holding that Zimmerman was entitled to his salary for the period between May 20, 1955 and June 30, 1955, citing *Lowenstein v. Newark Board of Education,* 33 *N. J.* 277 (1960), and in part affirmed, upholding defendant's refusal to re-employ Zimmerman. Zimmerman appealed to the State Board of Education which affirmed the Commissioner's determinations. Zimmerman appealed from the refusal to order re-instatement beyond the end of the 1955 academic year. While his appeal was pending before the Appellate Division, we certified the cause on our own motion.

No appeal was taken by the Newark Board of Education from the order for payment of salary for the period from May 20, 1955 to June 30, 1955. We shall consider, therefore, only the tenure claim.

█ It has been said that the purposes of an educational system are to further the best interests of the community at large, the teachers and especially the school children. Both the appointment of school teachers and the determination regarding their term of office are, subject to constitutional restrictions, within the power and control of the Legislature. Historically the employment relationship between a school teacher and the municipal school body has been one of master and servant, one subject to termination at will. Absent statutory provision a teacher was in a posi-

tion similar to that of any other public employee whose employment was not protected by statute, *i. e.,* his employment was subject to contract or the pleasure of his employer. 4 *McQuillin, Municipal Corporations* § 12.250, *p.* 305 (3 *ed.* 1949); 78 *C. J. S. Schools and School Districts* §§ 152–201 (1952). See *Vitarelli v. Seaton,* 359 *U. S.* 535, 539, 79 *S. Ct.* 968, 3 *L. Ed. 2d* 1012, 1016 (1959); *Forkosch, Administrative Law* § 116, *pp.* 177–78 (1956). In fact it was the right of *either party, i. e.* the school administration or the teacher, subject to the below limitations to terminate service before statutory tenure rights became effective. *Ahrensfield v. State Board of Education,* 126 *N. J. L.* 543 (*E. & A.* 1941). We note in passing that such an unprotected employee relationship is not uncommon in our State today for many public employees are still in such an unprotected and uncertain employment status. *New Jersey Civil Service Commission, Department Civil Service, Fifty Fourth Annual Report,* 1960–1961, *p.* 16.

In *People ex rel. v. Chicago,* 278 *Ill.* 318, 116 *N. E.* 158, 160, *L. R. A.* 1917E, 1069 (*Sup. Ct.* 1917) the court stated the historically prevalent view:

"A new contract must be made each year with such teachers as [the board] desires to retain in its employ. No person has a right to demand that he or she shall be employed as a teacher. The board has the absolute right to decline to employ or to re-employ any applicant for any reason whatever or for no reason at all. The board is responsible for its action only to the people of the city, from whom, through the mayor, the members have received their appointments. ＊ ＊ ＊ Questions of policy are solely for the determination of the board, and when they have once been determined by it, the courts will not inquire into their propriety."

Today, the powers of a board of education in appointment, transfer or dismissal are not so broad. They are limited by the Fourteenth Amendment of the *United States Constitution.* For example, in *Morris v. Williams,* 149 *F. 2d* 703, 708–09 (8 *Cir.* 1945), the court held that a custom or usage of a school board in discriminating against Negro

teachers of Little Rock in respect to salaries solely on account of color violates the Fourteenth Amendment. The board's powers are also limited not only by the terms of the contract of employment but also by the New Jersey Constitution, by the Teacher's Tenure Act, and by other statutory provisions such as the Law Against Discrimination, *N. J. S. A.* 18:25–1 *et seq. Cf. Downs v. Board of Education, Hoboken,* 12 *N. J. Misc.* 345, 348, 171 *A.* 528 (*Sup. Ct.* 1934), affirmed on opinion below, 113 *N. J. L.* 401 (*E. & A.* 1934). Except as provided by the above limitations or by contract the Board has the right to employ and discharge its employees as it sees fit. *Cf. Halfacre v. Board of Education of School Dist. No. 167,* 331 *Ill. App.* 404, 73 *N. E.* 2d 124 (*Sup. Ct.* 1947).

In New Jersey, as well as elsewhere, today legislatures have provided that teachers may, by satisfying certain conditions, acquire permanent tenure so as to be subject to dismissal only for cause and in the manner provided by law. Such statutes changed the unlimited common-law right of boards of education to contract with teachers. In principle, civil service benefits and protection were accorded teachers by the legislatures. The objectives are to protect competent and qualified teachers in the security of their positions during good behavior, and to protect them, after they have undergone an adequate probationary period, against removal for unfounded, flimsy, or political reasons.

The defendant Board contends that tenure statutes should be construed strictly and in favor of school boards on the ground that such statutes create a new liability on the part of such boards and that the statutes should be given a construction which is most favorable to the general public, not a construction which will subordinate the paramount rights and welfare of the general public and of school children to those of the teachers. For emphasis it asserts that a teacher's tenure is subordinate to the fundamental public policy of obtaining a better education for children (*Jacobs v. School District of Wilkes-Barre Township,* 355 *Pa.* 449, 50 *A.* 2d

354, 357 (*Sup. Ct.* 1947)) and that policy should guide a board's exercise of power to grant or deny re-employment to a probationary teacher at the end of a pre-tenure employment. The fear is expressed that the statute will be interpreted to deprive school administrators of their power and responsibility for the administration of schools.

■ As we have already emphasized, teacher tenure is a statutory right imposed upon a teacher's contractual employment status. In order to acquire the status of a permanent teacher under a tenure law and with it the consequent security of permanent employment, a teacher must comply with the precise conditions articulated in the statute. *Moriarity v. Board of Education of Garfield*, 133 *N. J. L.* 73 (*Sup. Ct.* 1945), affirmed 134 *N. J. L.* 356 (*E. & A.* 1946); *Ahrensfield v. State Board of Education, supra;* 78 *C. J. S., Schools & School Districts* § 180, *p.* 1014 (1952).

In our State tenure status may be secured by a teacher only after employment for the probationary periods specified in *N. J. S. A.* 18:13–16 as follows:

"The services of all teachers  *  *  *  of the public schools  *  *  * shall be during good behavior and efficiency, (a) after the expiration of a period of employment of three consecutive calendar years in that district unless a shorter period is fixed by the employing board, or (b) after employment for three consecutive academic years together with employment at the beginning of the next succeeding academic year, or (c) after employment, within a period of any four consecutive academic years, for the equivalent of more than three academic years  *  *  *.

An academic year, for the purpose of this section, means the period between the time school opens in the district after the general summer vacation until the next succeeding summer vacation."

Once a teacher acquires tenure status, he cannot be dismissed "except for inefficiency, incapacity, conduct unbecoming a teacher or other just cause" and certain procedural prerequisites are required. *N. J. S. A.* 18:13–17. See also *N. J. S. A.* 18:3–23 *et seq.*

Inherent in the tenure legislation is the policy that a board's duty to hire teachers requires more than merely

appointing licensed instructors; it demands that permanent appointments be made only if the teachers are found suitable for the positions after a qualifying trial period. In essence this constitutes a "proving out" period. In another context, we said in *Cammarata v. Essex County Park Comm'n.*, 26 *N. J.* 404, 412 (1958):

"It is difficult to evaluate the character, industry, personality, and responsibility of an applicant from his performance on a written examination or through cursory personal interviews. Knowledge and intelligence do not alone [suffice] * * *. The crucial test of his fitness is how he fares on the job from day to day when suddenly confronted by situations demanding a breadth of resources and diplomacy. Many intangible qualities must be taken into account, and, since the lack of them may not constitute good cause for dismissal under a tenure statute, the [employer] * * * is entitled to a period of preliminary scrutiny, during which the protection of tenure does not apply, in order that it may make pragmatically informed and unrestricted decisions as to an applicant's suitability."

The same thoughtful philosophy applies with manifold emphasis to the selection of school teachers. See *Morris, supra*, 149 *F. 2d*, at *p.* 708.

## I.

With the above authorities in view, we consider appellant's contentions. He contracted with the defendant on June 30, 1952, to begin teaching on September 1, 1952. In his view recognition of his employment status up through June 30, 1955 would constitute "employment" for the required period. In practice many, if not most, teachers are hired far in advance of the time they are to begin teaching. Contracts are frequently entered into during one academic year anticipating an employment relationship at the commencement of the following academic year. Thus, if appellant's interpretation of the word "employment" were to be adopted, tenure would be acquired in many instances before the teacher had completed teaching for three academic years. That interpretation would also shorten the length

of the minimum probationary period specified in terms of "academic" years as the latter is defined in the last paragraph of *N. J. S. A.* 18:13–16, quoted above. Such a reading would clearly detract from the statutory purpose.

Our former Supreme Court had occasion to interpret the word "employment" contained in *N. J. S. A.* 18:13–16 under similar circumstances and held contrary to the position urged by Zimmerman. *Carroll v. State Bd. of Education,* 8 *N. J. Misc.* 859, 152 *A.* 339 (*Sup. Ct.* 1930). There a teacher signed a one year teaching contract (and the Board approved it) on July 15, 1926, to begin teaching on September 7, 1926. Two subsequent annual teaching contracts were also entered into and each contained a provision that either party could terminate the agreement upon 30 days' notice. The board served notice on July 15, 1929, that it would terminate the relationship as of August 15, 1929. The court held that "employment" had not originally commenced until September 7, 1926, and, therefore, the teacher had not been employed for three calendar years. Compare *Chalmers v. State Board of Education,* 11 *N. J. Misc.* 781, 168 *A.* 236 (*Sup. Ct.* 1933).

We agree with this interpretation. Consequently, appellant was not employed for three calendar years prior to June 30, 1955, within the meaning of the statute. It follows that he is not entitled to tenure on that theory.

## II.

Zimmerman's next contention is based upon the testimony of the principal of the school in which Zimmerman taught. In the opinion of that witness "tenure" would normally follow automatically where a teacher had received satisfactory ratings for three academic years. Up to the point of the House subcommittee hearings, Zimmerman had received such ratings. But the argument overlooks the nature of the employment relationship between a teacher and the Board.

█ Except for statutory conditions, a teacher is retained solely on a contract basis during his probationary employment. At the expiration of an annual contract period, the employment relationship ceases to exist unless a new contract has been entered into. While some states provide for automatic re-employment or renewal of contract unless contrary notice is given, our statute does not so specify. And except to the extent of constitutional or statutory limitations, there is no legal duty on the part of a board to re-employ a teacher at the end of a contract term. *Brooks v. School Dist. of Moberly, Mo.,* 267 *F. 2d* 733, 739 (8 *Cir.* 1959), *cert.* denied 361 *U. S.* 894, 80 *S. Ct.* 196, 4 *L. Ed. 2d* 151 (1959); *Rees v. Murray City Board of Education,* 6 *Utah 2d* 196, 310 *P. 2d* 387, 388 (*Sup. Ct.* 1957); *Bourne v. Board of Education of City of Roswell,* 46 *N. M.* 310, 128 *P. 2d* 733 (*Sup. Ct.* 1942); *Knickerbocker v. Redlands High School Dist.,* 49 *Cal. App. 2d* 722, 122 *P. 2d* 289, 291 (*D. Ct. App.* 1942); *Chase v. Mason,* 216 *App. Div.* 562, 216 *N. Y. S.* 205 (*App. Div.* 1925), aff'd 244 *N. Y.* 545, 155 *N. E.* 890 (*Ct. App.* 1926).

█ Accordingly, unless Zimmerman by an affirmative act of the Board was re-employed subsequent to June 30, 1955, he cannot be said to have been employed for three consecutive academic years "together with employment at the beginning of the next succeeding academic year." *N. J. S. A.* 18:13–16. This statutory step had to take place, for, "it is axiomatic that the right of tenure does not come into being until the precise condition laid down in the statute has been met." *Ahrensfield, supra,* 126 *N. J. L.,* at *p.* 544.

We hold that Zimmerman is not entitled to tenure status upon this ground.

### III.

█ If in 1955 after the 1954-1955 academic year the Board had decided to continue Zimmerman in its employ but stated in the resolution of employment that such em-

ployment should not constitute tenure, there could be no doubt that Zimmerman nevertheless would have tenure by operation of the statute. Recognition by the Board of an employment relationship continuing until 1957 would entitle Zimmerman to tenure.

Zimmerman contends that this is precisely what the Board did here, that the Board is now estopped to contend otherwise because it continued to hold hearings after June 30, 1955 and that, moreover, after each successive hearing the Board dismissed him as of May 20, 1955, the day after he relied upon his constitutional privilege before the House Committee. He concludes that he has been dismissed in violation of his tenure rights under *N. J. S. A.* 18:13–16 essentially because he invoked his constitutional privilege.

Defendants counter by pointing out that all of the proceedings leading to the dismissal reviewed in *Laba* were completed before the end of the 1954-1955 school year. A schedule of these proceedings would indicate that notification of suspension was given on May 19, 1955; charges were filed on May 23, 1955; the determination to dismiss was made on June 23, 1955, effective May 20, 1955; and the formal resolution and findings are dated June 28, 1955. Defendants say they preferred charges and held formal hearings not because appellant was under tenure but because it was necessary to determine whether there was good cause for dismissing Zimmerman for the then academic year, 1954-1955. Defendants conceded that if there was not good cause shown for the dismissal during the academic year, Zimmerman was entitled to his salary until the end of his contract term, *N. J. S. A.* 18:13–11, although he would not be entitled to continue as a practicing teacher in the school system.

Defendants further contend that Zimmerman himself caused the proceedings to extend beyond the 1954-1955 academic year by appealing from the action of the Board. An employment status after that academic year should

not be spelled out, they urge, merely because further hearings were necessitated by such appeals and by suggestions of this court. In their view, inasmuch as the Board was merely inquiring whether Zimmerman should be denied employee status for the remainder of his contract term, it would be anomalous to spell out of the entire proceedings an intention on defendants' part to recognize a continuing employee relationship after the 1954-1955 academic year.

We need not decide whether recognition of a continuing employment relationship might be implied under some circumstances. Compare *R. S.* 18:13–5, 18:13–6 and 18:13–7. Here, the evidence does not support an inference of such recognition. Indeed the proof is to the contrary and the Board expressly denied any such intention.

In its brief filed in *Laba* the Board made the following statement (at *page 2*):

"Appellant Zimmerman did not have 'tenure' (*R. S.* 18:13–16) as did appellants Laba and Lowenstein. His employment had about six weeks to go at the time of his suspension on May 19, 1955 and his dismissal involves his status from that date to the end of the 1954-1955 school year. Throughout the proceedings, however, it has been assumed that his employment *for that six weeks period* was subject to termination only under circumstances applicable if he had tenure (*R. S.* 18:13–17)." (Emphasis added.)

And we expressly recognized in *Laba* that Zimmerman was in a different category than the other two defendants there who were at that time protected by the tenure laws. (23 *N. J.*, at *p.* 370):

"[Mr. Zimmerman] began teaching in the public school system * * * in 1952 and had not acquired tenure protection when he was dismissed by the board. However, in view of the terms of *R. S.* 18:13–11, all of the parties and the State Commissioner have, *for present purposes*, not differentiated his case from the others." (Emphasis supplied.)

These statements clearly limit the effect of that proceeding.

In the proceedings which followed *Laba* defendants repeatedly denied any employment relationship between

Zimmerman and the Board. At the end of his report dated May 16, 1957 the defendant Superintendent stated:

"Note: Attention of the Board of Education is called to the fact that Mr. Perry Zimmerman had not acquired tenure as of the date of his suspension on May 19, 1955, and would not have acquired tenure even if he had remained in active teaching service to the end of the school year. Had that been the case, he would have completed only three years of teaching service. In order to acquire tenure it is necessary to have had more than three years of teaching service. Should the Board of Education determine for any reason to re-instate Mr. Perry Zimmerman for the period from May 19, 1955, to the end of the 1954-1955 school year,—the only period involved in the Board's previous dismissal action,—the Superintendent wishes to make it clear that he does not recommend the re-employment of Mr. Perry Zimmerman for any further or additional period of time that would result in his acquisition of tenure in the Newark public school system."

When on September 24, 1957 the Board ordered "further proceedings" in accordance with the "decision of the Supreme Court and the mandate thereon entered on February 4, 1957," it was careful to include the following in its resolution:

"RESOLVED that the within resolution shall not be deemed to extend to the said Perry Zimmerman any employment or tenure status with the Board for any period beyond the 1954-1955 school year when the period of his probationary employment expired."

And the Board's resolution of June 24, 1958 setting forth its findings and conclusions on the supplementary charges contains the provision that:

"The adoption of this resolution is not intended to constitute an acknowledgment that Mr. Zimmerman had any employment or tenure status with the Board, and shall not be deemed to extend to him any such status, for any period beyond the 1954-1955 school year, when the period of his probationary employment expired."

In view of these observations and disclaimers it would be patently unreasonable to spell out any implied recognition of an employment relationship.

The above statements also make it clear that the Board did not waive its right to deny Zimmerman's employee

status. Nor can we sustain Zimmerman's argument that the Board is now estopped to deny an employment relationship. Even if we were to assume that the facts might give rise to an inference that the Board recognized Zimmerman as an employee, the doctrine of "estoppel" urged by Zimmerman requires an element of justifiable reliance upon the acts of another and resulting injury brought about by such reliance. Here the Board continually asserted that Zimmerman was dismissed on May 20, 1955 and repeated its disclaimer of any employment relationship after the 1954-1955 academic year. On these clear facts we think that Zimmerman could not justifiably rely on the Board's actions in the belief that his continuing employment was recognized by the Board.

The decision of the State Board of Education is affirmed; no costs.

WEINTRAUB, C. J. (concurring). I agree with the result reached in the opinion of the court but for the reason stated in "I" below.

It having thus been found that Zimmerman did not have tenure, we need not, for the purposes of this case, consider the manner in which the proceedings were handled, but since for the reasons in "II" below I believe our mandate on the prior appeal was grossly disregarded, I think we should say so, lest what happened here be repeated in another matter.

## I.

As a general proposition, powers vested in local government must be exercised reasonably and the judiciary will review local action for arbitrariness. *Hertz Washmobile System v. South Orange,* 41 *N. J. Super.* 110, 132 (*Law Div.* 1956), affirmed 25 *N. J.* 207 (1957). The question is whether probationary employments are beyond that proposition.

The Legislature intended wide latitude in the employing authority to determine fitness for permanent employment. It is clear that public employment may not be refused upon a basis which would violate any express statutory or constitutional policy. A simple example would be discrimination for race or religion. But I am not sure such specific limitations are the only restraints. If the employing agency, for an absurd example, thought blondes were intrinsically too frivolous for permanent employment, a court would find it difficult to withhold its hand.

But if we may inquire into "unreasonableness," it would seem to follow that there must be a "reason," i. e., "cause" for refusal to continue the teacher into a tenure status. That course has its difficulties. It would not mean the court would not recognize a wide range of "reasons" or would lightly disagree with the employer's finding that the "reason" in fact existed. But it would follow that upon demand the teacher would be entitled to a statement of the grounds, with the right to a hearing and to a review as to whether the grounds are arbitrary in nature or devoid of factual support. But see *Vitarelli v. Seaton,* 359 *U. S.* 535, 539, 79 *S. Ct.* 968, 3 *L. Ed. 2d* 1012, 1016 (1959); *cf. Cafeteria and Restaurant Workers Union v. McElroy,* 367 *U. S.* 886, 81 *S. Ct.* 1743, 6 *L. Ed. 2d* 1230 (1961). Such individual inquiries could involve some practical problems in the administration of a school system.

I think the question might well be left for another day, since here the reason was given and I cannot say it is arbitrary in nature or unfounded in fact.

It is clear the Board would not continue Zimmerman because he pleaded the Fifth Amendment before the House subcommittee when his connection with communism was the subject of inquiry. As we held in *Laba v. Newark Board of Education,* 23 *N. J.* 364 (1957), the assertion of a federal constitutional right does not constitute "cause" for the dismissal of a teacher with tenure. Nor can that assertion support an inference that the teacher is disloyal. Here,

however, we are dealing with a refusal to accord permanency to a probationary employee.

The question is whether it is unreasonable to refuse to employ an individual because he claimed the privilege from self-incrimination. Like it or not, the fact is that many people do draw from the claim of the privilege the very inference which legally may not be drawn. Even some who are tutored in law will privately draw the inference or harbor a doubt, albeit they understand that in public matters they must be faithful to what the *Constitution* commands. And as to many laymen, the plea of the Fifth Amendment does envelop a teacher in suspicion or worse. He becomes a controversial figure.

Thus the issue is whether a school board may refuse to employ a teacher so situated when to employ him may involve the board in a controversy with an appreciable segment of the public. The question is not whether as an individual I would applaud a different decision. Rather the question is whether as a judge I can denounce that decision as arbitrary. I do not see how I can. I believe the Board, taking into account the climate of the times and the fears, however unwarranted, of the parents of students, could conclude it is the course of prudent management to employ someone else. That, it seems to me, was the decision the Board made. The Board went too far when it attempted to terminate the existing annual contract of employment because of the claim of privilege, but I cannot say it exceeded its discretionary power when it refused to re-engage him thereafter.

## II.

Our holding that Zimmerman did not have tenure makes academic the finding of the Board that, if he had tenure, there nonetheless was cause for dismissal. But the way in which the matter was handled so palpably violated the principles laid down in *Laba* and was so fundamentally

unfair that we should not let it pass without an expression of disapproval.

In *Laba* we held that the plea of self-incrimination before the House subcommittee justifies an inquiry before the local Superintendent with respect to present loyalty. We said that in the inquiry the teacher must cooperate, and that if he refuses to answer pertinent questions so that a decision as to present loyalty cannot be made, he may be dismissed for refusing to answer. Thus the *target issue* is present loyalty, but the teacher may be dismissed without a decision on the *target issue* if it cannot be reached because he *blocks* the inquiry *by silence*. In the words of *Laba* (23 *N. J.*, at *p*. 389):

"* * * If after the inquiry it appears that the teachers are now members of the Communist Party or are now subject to its ideologies and disciplines * * * or that they have *willfully refused to answer* pertinent questions fairly submitted by their administrative superiors * * * then there would seem to be ample basis for board action within the broad and valid statutory standard embodied in *R. S.* 18:13–17." (Emphasis added)

Zimmerman appeared before the Superintendent. He answered *every question* put to him. Nonetheless, the Superintendent made no finding upon the *target issue* of present loyalty. Nor did the Superintendent find (and he could not) that Zimmerman *refused to answer* any question. Rather the Superintendent filed supplementary charges that:

(1) Zimmerman "failed to fulfill his duty of cooperation" in the interview.

(2) He "failed to give frank and full disclosures as to past association with the Communist Party and affiliated organizations."

(3) He "deliberately failed to accord to the Superintendent of Schools the frankness and cooperation which were due to the Superintendent" in the inquiry.

(4) He "failed to fulfill the affirmative burden which was his * * * in the establishment of his fitness to teach."

(5) "The aggregate responses of the said Perry Zimmerman and his general demeanor and conduct in the said interview, evidenced a conscious purpose to evade, equivocate, and confuse."

(6) "Many of the responses * * * were incredible, indirect, or otherwise inadequate from the standpoint of forthrightness due from him in an inquiry to determine his fitness to teach."

(7) He, "by his aggregate responses and by his total conduct in the said interview, impeded a fair and conscientious inquiry by the Superintendent of Schools to determine" whether he is or was a member or subject to the ideologies and discipline of the Communist Party; "and was guilty of insubordination and conduct unbecoming a teacher."

Appended was a list of references to the transcript of the interview to which the Superintendent called "particular attention."

Upon these nebulous charges a hearing followed before the School Board. It was an aimless affair, and understandably so, since there was nothing to aim at. The Board, after alluding to a series of responses to the Superintendent's questions, joined in the characterizations embodied in the charges leveled by the Superintendent. The Board added some more of its own in the resolution it adopted after the hearing had ended, i. e., that Zimmerman before it "evidenced resentment of and hostility to the entire inquiry, and a lack of forthrightness and candor."

The Board did disavow so much of charge No. 4 above as "implies that it was Mr. Zimmerman's legal burden to prove his fitness in the within proceedings" and hence "Charge 4 is dismissed." In this single respect, the Board was eminently correct, since *Laba,* although it referred to a teacher's "burden" to cooperate, did not impose upon him the burden of proving fitness upon the pain of loss of tenure if he failed to persuade the interrogator. And since no testimony was taken as to Zimmerman's "demeanor" before the Superintendent, the Board concluded that so much of charge No. 5 as rests thereon "is dismissed." The Board added that it "has drawn no inferences as to present affiliation with or subservience to the Communist Party." Nor, as we have said, did the Superintendent make any finding on that issue.

*Laba* was perfectly plain in its mandate. The *target issue* of present loyalty was to be decided, unless *and only unless* the teacher *willfully refused to answer.* Zimmerman having answered, it was the plain duty of the Board to make a forthright decision of the *target issue.* It did not. Instead it devised a new basis for dismissal. It held that if the answers given impressed it as "evasive" or "incredible" (whatever that means in this context), it follows there was a lack of "cooperation" constituting cause for destruction of tenure rights.

The quality of the answers given was simply a factor to be weighed in deciding the *target issue* of present loyalty. When in *Laba* we held that a *willful refusal to answer* would constitute a basis for dismissal, I understood it to mean precisely that and nothing else. A refusal to answer blocks the inquiry. Here the inquiry was not blocked in the least. Indeed the Board did not find, and could not find, that the hearing was thwarted. The closest expression in that regard was its concurrence in the hazy charge (No. 7) of the Superintendent that Zimmerman "by his aggregate responses and by his total conduct in the said interview, impeded a fair and conscientious inquiry by the Superintendent." What specific answers so "impeded" the inquiry, we are not told. The most I gather from the rambling resolution is that the Board believed "The conclusion is inescapable that both at the interview and at the Board's hearing the whole truth as to Mr. Zimmerman's past affiliation with and his reported withdrawal from the Communist Party was not disclosed by him." How that "inescapable" conclusion was reached and how it "impeded" a decision upon present loyalty, are not revealed. The thinking of the Board is hidden in a bushel of words.

It is one thing to discount testimony as evasive or incredible and hence unequal to evidence on the other side of an issue; that is routine in the process of resolving factual disputes. It is quite another thing to charge that such testimony constitutes an act of misconduct and then

to adjudge the witness guilty upon nothing more than the same appraisal of the questioned testimony. That is what happened here, and it cannot be obscured by calling the alleged misconduct a "failure to cooperate." That mode of condemnation is foreign to our concept of justice.

Even *perjured* testimony "need not necessarily * * * obstruct or halt the judicial process. For the function of trial is to sift the truth from a mass of contradictory evidence, and to do so the fact finding tribunal must hear both truthful and false witnesses." *In re Michael,* 326 *U. S.* 224, 227–228, 66 *S. Ct.* 78, 80, 90 *L. Ed.* 30, 33 (1945); see *People ex rel. Valenti v. McCloskey,* 6 *N. Y.* 2*d* 390, 189 *N. Y. S.* 2*d* 898, 160 *N. E.* 2*d* 647 (*Ct. App.* 1959), appeal dismissed 361 *U. S.* 534, 80 *S. Ct.* 585, 4 *L. Ed.* 2*d* 537 (1960); *People ex rel. Valenti v. McCloskey,* 8 *N. Y.* 2*d* 959, 204 *N. Y. S.* 2*d* 188, 168 *N. E.* 2*d* 853 (*Ct. App.* 1960).

It may well be that *perjury* constitutes an independent cause for dismissal. But, if so, perjury must be charged, and willful falsity must be proved. Here there was no charge of perjury, and no evidence whatever was offered to prove that any answer was in fact untrue. Rather the Superintendent and the Board simply concluded that, in their wholly subjective evaluations, some of the answers were "incredible" or "evasive." *Ergo,* there was "cause" for dismissal. I cannot agree that the tenure status of public employees may be destroyed by a process so vague and arbitrary.

We all know that some people cannot see too clearly when loyalty is in issue and especially when, as here, a man admits he was once a member of the Communist Party. Indeed the danger is real that the administrative hearing will be but the guise for a predetermined result. The basis for discharge the Board here devised would be obviously intolerable if a tenure-employee were charged with something less befogging than communism. If the inquiry related, for example, to "moonlighting," I would think that

no one would fail to see the injustice of a dismissal, not because of "moonlighting," but because the hearer thought some answers were "incredible" or "evasive." These are faceless words. A public employee is entitled to charges that can be nailed down and made the subject of a visible inquiry.

FRANCIS, J. (concurring). I agree with the opinion of the court that Zimmerman did not have tenure status when his teaching contract expired on June 30, 1955, and that the Board of Education was under no obligation to rehire him for the school year beginning September 1955.

In ordinary circumstances it is not the practice to comment on concurring opinions. They are not precedents and they are binding on no one. Frequently, however, they put forward constructive ideas or suggestions which merit sponsorship if and when the problem discussed is directly in issue. But when such an opinion criticizes a public agency unjustly, particularly when the criticism is not necessary to determination of the basic issue involved in the case, conventional considerations must be put aside. From my study of the record, I am convinced that the Superintendent of Schools and the Board of Education acted in the utmost good faith and did their conscientious best to follow the earlier opinions of this court. But more than this; I believe the decision of the Superintendent and the Board was warranted on the evidence. Also, having in mind the sensitive area in which public school teachers work and the malleable minds they are engaged to develop, I am satisfied that the final action of the Board was in accord with the public interest. See *Adler v. Board of Education*, 342 *U. S.* 485, 493, 72 *S. Ct.* 380, 96 *L. Ed.* 517, 524 (1952).

On May 19, 1955 Perry Zimmerman, Estelle Laba and Robert Lowenstein, teachers in the public school system in Newark, New Jersey, were called to testify before a subcommittee of the House Un-American Activities Committee. On being questioned as to present and past membership in

the Communist Party they declined to answer, relying on the protection provided by the Fifth Amendment of the *United States Constitution* against possible self-incrimination. Four days later, they were dismissed by the Board of Education. This court sustained a reversal of the dismissal by the State Commissioner of Education, holding that resort to the constitutional guaranty to avoid such questioning could not of itself justify discharge of a teacher. It was declared, however, that such a plea warranted an inquiry into past and present affiliation with the Communist Party, or adherence to its ideologies and disciplines in order to determine "present" or "current" loyalty to the United States Government. Accordingly, a remand was ordered to the Board of Education for that purpose. *Laba v. Newark Board of Education,* 23 *N. J.* 364 (1957).

Some observations in *Laba* should be recalled for purposes of reorientation. Speaking of the danger of Communist Party members as teachers in the public school system Justice Jacobs, speaking for the court, said:

"The matter may no longer be viewed simply as one of academic freedom of thought and expression, for it has actually become one of self-preservation; we are convinced that Communism is an alien concept which is dedicated to the overthrowal of our form of government, by force if necessary, and seeks to deprive us of the very basic constitutional liberties which we all hold so dear; \* \* \*." 23 *N. J.*, at *p.* 388.

That view is not peculiar to New Jersey. The United States Supreme Court referred to it as "the long and widely accepted view." *Barenblatt v. United States,* 360 *U. S.* 109, 128, 79 *S. Ct.* 1081, 1093, 3 *L. Ed. 2d* 1115, 1129 (1959). Moreover, in our sister state, Pennsylvania, the Supreme Court took judicial notice that the Communist Party is a subversive organization which conspires to teach and advocate the overthrow of the government of the United States by force and violence. *Appeal of Albert,* 372 *Pa.* 13, 92 *A. 2d* 663 (1952).

· The opinion in *Laba* continued:

"We have no doubt that in examining into their continued fitness to teach the Newark school authorities may interrogate the appellant school teachers with respect to their present and past associations with the Communist Party and affiliated organizations and are entitled to frank and full disclosures." At page 388.

And:

"In the instant matter the teachers' conduct before the Congressional subcommittee reasonably calls for a fitness inquiry during which the teachers have a duty of cooperation and an affirmative burden in the establishment of their fitness." At page 392.

*Laba* quoted with apparent approval the opinion of the Association of American Universities that "invocation of the Fifth Amendment places upon a professor a heavy burden of proof of his fitness to hold a teaching position and lays upon his university an obligation to re-examine his qualifications for membership in its society." It referred also to the report of the Association of American Law Schools' Committee on Academic Freedom and Tenure, "composed of distinguished legal scholars," to the effect that "a faculty member's invocation of the Fifth Amendment would not 'in and of itself' constitute ground for dismissal but was sufficient to call for a general fitness inquiry by his educational institution." At *page* 375.

On the remand, therefore, Zimmerman had a heavy duty of *cooperation* in the inquiry. Justification for interrogation did not rest alone on his use of the Fifth Amendment before the Congressional Committee. He was aware that the public policy of this State as established by the Legislature is opposed to appointment or retention of teachers in the public school system who believe in or advocate the overthrow of the State or Federal Government by force or violence. *N. J. S. A.* 18:13–9.1, 9.2; 41:1–3; *N. J. S. 2A*:81–17.1. He knew also that before entering the public service as a teacher in 1952 he had answered a loyalty

questionnaire under oath which, among other things, asked if he had ever become "a member of any society or group of persons which teaches or taught or advocates or advocated that the government of the United States of America, or of any state or political subdivision thereof, should be overthrown, or overturned, or changed by force or violence, or any unlawful means?" His sworn answer to this was: "No," although admittedly he had been a member of the Communist Party at least from 1946 until the latter part of 1948. See *Laba, supra,* at *page* 373.

Moreover, since, unlike Mrs. Laba and Lowenstein, he did not have tenure, as this court unanimously agrees, his hearing took on a twofold aspect. His contract of employment terminated on June 30, 1955. Therefore, for purposes of determining rights under that contract, the issue of "current" or "present" loyalty or membership in the Communist Party or adherence to its aims and disciplines, within the meaning of *Laba,* related to the period from May 19, 1955 to June 30, 1955. Secondly, although the matter was not expressly stated in such terms, both Zimmerman on the one hand and the Superintendent of Schools and the Board of Education on the other, were conscious that, in fairness, a decision should be made whether to continue or to re-engage him as a teacher in the system. On this latter phase of the matter obviously a much broader interrogation might justifiably be pursued.

The rehearing was held on May 16, 1957. I agree with the Board of Education that it was fairly and conscientiously conducted by the Superintendent. At its conclusion he found, among other things, that Zimmerman (1) had failed to fulfill his duty of cooperation in the inquiry, (2) had failed to give frank and full disclosures as to past association with the Communist Party, (3) had evidenced a conscious purpose to evade, equivocate and confuse, (4) had given many responses which were incredible, indirect and otherwise inadequate, and (5) that by his aggregate responses and his total conduct in the interview he had im-

peded a fair and conscientious inquiry to determine whether when he was suspended on May 19, 1955, he was or since that date had been or now is a member or subject to the ideologies and discipline of the Communist Party.

In response to the Superintendent's questions and to those propounded later by the Board of Education, Zimmerman admitted that he joined the Communist Party in 1946, but asserted inability to recall whether the Party solicited his membership or whether he sought out the Party. He paid dues to the Party but could not recall whether by check or cash ("Not the slightest recollection."). He alleged inability to recall whether he carried a card as a member of the Party. During the 1946-1948 membership period he claimed to have very little idea of Communist Party theory, although at the subsequent hearing before the Board of Education he indicated that he had attended at least 50 Communist Party meetings while a member and that its program and purposes were discussed at them. On being asked if, when he joined the Party, he knew that one of its objectives was the overthrow of the government of this country by force, he said: "The answer is that I still do not believe that is part of the Communist Party program to do this which you state. The answer is no." Further, he said his experience with the Party revealed nothing that would establish incompatibility between membership therein and teaching in the public schools.

Zimmerman testified also there was no incompatibility between his membership in the Party in 1946 through 1948, and his sworn answer in the loyalty questionnaire that he had never been a member of any society or group of persons "which teaches or taught or advocates or advocated that the government of the United States of America * * * should be overthrown, or overturned, or changed by force or violence, or by any other unlawful means." He asserted that had he been asked if he had been a member of the Communist Party, he would have answered affirmatively. But since he did not know, on joining the Party or after

attending more than 50 meetings at which its program was discussed, or at any time, that such was the purpose of the Party, he considered the negative answer under oath to be proper.

On leaving the Party he remembered that he gave no formal resignation. But he could not say "with the slightest degree of accuracy" when he last paid dues. In any event, he regarded the subject of so little consequence as not to warrant an effort to recall or find out. In passing, it may be noted that he characterized the Superintendent's interview as "savage," and with respect to the later hearing before the Board of Education he said he considered "this free wheeling inquisition itself an insult." In its findings, the Board commented upon Zimmerman's "low regard for his obligations at the Superintendent's interview," and that throughout his testimony before it "he evidenced resentment of and hostility to the entire inquiry, and a lack of forthrightness and candor." The Board declared "the conclusion to be inescapable that both at the interview and at the Board's hearing the whole truth as to Mr. Zimmerman's past affiliation with and his reported withdrawal from the Communist Party was not disclosed by him, * * *." I agree with the Board that his entire testimony fairly breathes an attitude of insolence and supercilious contempt for the questions that were put to him.

Zimmerman had been a Communist and he had been untruthful about it under oath when he was appointed a Newark teacher. He said he had left the Party in the latter part of 1948. Since he did not plead the Fifth Amendment until 1955, the Board not only had the right but was under the duty to satisfy itself reasonably, through fair interrogation, that he had in fact resigned from the Party in 1948 and no longer adhered to its ideology and disciplines. Zimmerman's duty, in view of his admitted history, was to cooperate fully and frankly in a reasonable endeavor by the Board to determine his loyalty at the time of suspension and thereafter until June 30, 1955.

"Present" loyalty or membership in the Communist Party or adherence to its principles, at the time of the reinterview and back to the end of 1948, were proper subjects of inquiry. Questioning, at least to that extent, would enable the Board to reach a conclusion whether he had left the Party in 1948 and was loyal when suspended in May 1955. Further, since he did not have tenure, and indicated a desire to continue in the teaching profession, it was reasonable for the Board to delve into current loyalty, in the sense of loyalty at the time of the reinterview, so as to put itself in a position to give intelligent consideration to the question of reappointment to the system. In view of the restoration of Mrs. Laba after the reinterview with her, it cannot be said on the record that frank cooperation by Zimmerman would not have produced a similar result if the Board was satisfied that he had quit the Party and was no longer subject to its ideologies and disciplines.

But it would be blinding ourselves to reality to say that only by silence, *i. e.,* refusal to answer the Superintendent's questions, could Zimmerman improperly impede the loyalty inquiry. It is likewise unreal to suggest that because he answered every question put to him, he had cooperated to the extent called for by *Laba.* Obviously, the content of the answer and the honesty of the person giving it are of the essence.

Under the cases throughout the country, a former Communist Party member is not forever subject to discharge from a teaching post in the public school system in which he has tenure because of such membership alone. An honest *mea culpa,* in the sense of an actual withdrawal from the Party and abandonment of its program of overthrowal of our Government by force or violence, prior to the Board's inquiry, would remove the bar presented by the policy of our Legislature. Assuming that Zimmerman had done so, the history of these cases in Newark does not support the view that his suspension from May to June 30, 1955, would not have been withdrawn by the Board, or that the Board

would not have given favorable consideration to reappointing him prospectively. But the Board was convinced, as I am, in view of his past history, that he did not meet the obligation imposed by his record, of cooperation with the inquiry, that he did not act in good faith during it, and that by his attitude and demeanor, as well as by his incredible answers, he willfully prevented and frustrated the Superintendent's and the Board's attempt to ascertain his loyalty in 1955 and at the time of the reinterview.

In my judgment, therefore, analysis of all the facts revealed by the record fully supports the conclusion reached by the Superintendent and the Board of Education.

I am authorized to say that Justices SCHETTINO and HANEMAN join in this opinion.

PROCTOR, J. (concurring). The issue in this case is a narrow one, i. e., is the appellant entitled to reinstatement as a teacher with tenure. I agree with the opinion of Justice SCHETTINO that the appellant never achieved tenure status and therefore is not entitled to reinstatement on that basis. Since the answer to this question is dispositive of the case, I see no need for an excursion into tangential areas raised by the arguments.

WEINTRAUB, C. J., and JACOBS and HALL, JJ., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.