NICHOLAS NICOLETTA, PLAINTIFF-APPELLANT, v. NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION OF THE STATE OF NEW JERSEY *ET AL.*, DEFENDANT-RE-SPONDENT.

Argued November 14, 1977—Decided July 6, 1978.

146 

148

*Mr. Michael A. Casale* argued the cause for appellant (*Messrs. Bianchi* and *Colasanti,* attorneys; *Mr. Casale* of counsel on the brief).

*Mr. Andrew M. Marchese* argued the cause for respondent (*Mr. George J. Minish,* attorney).

The opinion of the court was delivered by

HUGHES, C. J. We certified this case in order to examine an unpublished Appellate Division holding adverse to the plaintiff-appellant, hereafter "Sergeant Nicoletta" or "Nicoletta." He had been discharged from his employment as a sergeant on the "Wanaque Reservoir Police Force." He challenged the validity of that termination in an action commenced in the Chancery Division. There he alleged that he had been discharged without fair notice and hearing of the charges against him, in violation of his constitutional right to due process.[1] By way of remedy he sought reinstatement to his position, the award of back pay for the period elapsed since his assertedly unlawful discharge, and such other relief as the court might deem "just and proper."

After hearing on return of an order to show cause, the Chancery Division judge decided that the issue belonged, by

---

[1]The Fourteenth Amendment to the United States Constitution provides in pertinent part:

Section 1. Due process of law

* * * nor shall any State deprive any person of life, liberty, or property, without due process of law; * * *.

*N. J. Const.* (1947), Art. I, par. 1 reads:

Natural and unalienable rights

1. All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

rule, in the Appellate Division. *R.* 2:2–3(a) (2). He transferred it thereto for it to review the final decision and action of Nicoletta's employer as a state administrative agency.

The Appellate Division first remanded the matter to such employer, the defendant-respondent North Jersey District Water Supply Commission (hereafter "Commission"),[2] to amplify the record by furnishing transcripts of "hearings" and basic findings of fact associated with the discharge of Sergeant Nicoletta. That being done, and the appeal having been argued, the Appellate Division decided that the findings of the Commission "amply support[ed] the result reached, *viz.,* the termination of * * * employment" and that it saw "no sound reason or justification for disturbing that result." This in deference to the appellate restraint recommended in *State v. Johnson,* 42 *N. J.* 146, 162 (1964).

It is not suggested by the record here that Sergeant Nicoletta was an employee ousted from a fixed term or was other than an employee at will, unprotected by any statutory tenure, contractual commitment or collective negotiation agreement. Nor did he enjoy Civil Service tenure or other protection. *See* note 2, *supra.* In such circumstances, under the common law, the employer, even though a public employer, has the right to discharge such employee with or without cause. *English v. College of Medicine and Dentistry,* 73 *N. J.* 20, 23 (1977). Sergeant Nicoletta nevertheless

---

[2]The North Jersey District Water Supply Commission is an entity created by statute to develop and protect public water supplies including the construction and operation of reservoirs. *N. J. S. A.* 58:5–1 *et seq.* The Wanaque Reservoir Police Force is established as a separate police system under the jurisdiction of the Commission. *N. J. S. A.* 58:5A–1 *et seq.* The Commission has "sole control of the appointment, compensation, terms and duration of employment and management of the said constabulary, for the securing of proper discipline and efficiency among the members thereof; * * *." *N. J. S. A.* 58:5A–2. By force of the same statute the Commission is not subject to the ordinary Civil Service rules which are protective of employees of other entities such as the State itself and various municipalities which are subject to the Civil Service laws.

insists that the incidents of his dismissal and the very statute empowering it were such as to violate his constitutional rights and entitle him to the relief sought, a contention essentially ignored in the Appellate Division disposition.

While the factual and procedural background is somewhat tangled, with some facts in dispute, it is clear enough, in any aspect, to project sufficient ground for our decision. It was apparent that a violent physical altercation had taken place at police headquarters between Sergeant Nicoletta and a fellow officer, Patrolman Russomanno. Nicoletta minimized his participation throughout, but Russomanno and several other fellow policemen onlookers pictured Nicoletta as the aggressor in three separate physical attacks on Russomanno, from which Nicoletta had to be restrained with force and with some difficulty. Shortly after the headquarters fight, Sergeant Nicoletta received a telegram advising him that he was suspended indefinitely without pay from his position. A few days later he received a letter inviting him to attend a meeting with the Commission to "confer on complaints that [he] did not follow requests of Chief George Destito [of the Wanaque Reservoir Police Force]." He attended this meeting on April 10, 1974, with counsel, as did Russomanno with his counsel, and met with some but not all of the Commission members, as well as the Commission counsel.

At this meeting the initial subject of interrogation by Commission counsel of Nicoletta and Russomanno had to do with the fight between them. Their accounts differed widely in details unnecessary to discuss here. Nicoletta (as was Russomanno) was afforded full opportunity, with the guidance of counsel, to present his version of the altercation. The inquiry then broadened to other alleged misdeeds and activities of Nicoletta such as his previous improper use of firearms, his filing of a belated and allegedly false report in derogation of Russomanno (involving an unconnected incident) and questions concerning the references he had listed in his original employment application. Here again

there was no restriction on Nicoletta's explanation, with advice of counsel, of his position on such matters.

None of these subjects, however, including the fight, had been identified in the letter (notice) which had summoned Sergeant Nicoletta to the conference. The record bespeaks the broad scope of inquiry, at the initial conference and at a later "hearing," leading to the Commission's final action.

The Commission's findings of fact were:

1. That on March 19, 1974 Sgt. Nicoletta without provocation initiated a violent altercation with Ptl. Russomanno in the presence of other members of the constabulary.

2. [T]hat Sgt. Nicoletta attempted to persuade Ptl. Saum not to report the assault upon Russomanno to higher authorities, in violation of his duties as a police officer.

3. That Sgt. Nicoletta deliberately withheld for two months a report of an alleged criminal episode, but entered a report attributing culpability to Ptl. Russomanno following the altercation, in an effort to discredit Russomanno without regard to his duties as a police officer.

4. That Sgt. Nicoletta engaged in conduct wholly inconsistent with his position and duties in the constabulary in that he had on several occasions engaged in repeated episodes of violent tempermental [sic] outbursts directed to other members of the force.

5. That Sgt. Nicoletta was incapable of maintaining discipline and morale among his subordinate officers due to his own behavior, including the abuse of brother officers.

The Resolution of May 9, 1974, dismissing Nicoletta read:

WHEREAS, the Commission has conducted extensive examination into the subject of the qualifications of Nicholas Nicoletta to meet the requirements for employment as a Patrolman on the Police force of the N.J.D.W.S.C., including an examination of his conduct as a police officer and re-examination of his pre-employment qualifications, extensive hearings with regard to various acts and conduct and it appearing that there has been good cause shown, it is
RESOLVED, that the employment of Nicholas Nicoletta be terminated as of March 27, 1974.

About a week after the first "hearing" some members of the Commission had another meeting ("hearing"), of which Sergeant Nicoletta was not specifically advised and which

he did not, of course, attend. However, he and counsel had been advised on April 10 that the Commission would be pursuing its investigation by interviewing other witnesses. He was invited by counsel for the Commission to suggest anyone else having knowledge of the facts, as follows:

* * * We expect to ask each of the people that were present in the headquarters or wherever this incident occurred to come and make a statement with regard to these incidences [*sic*], as well as the incidents involving the shotgun thing. Is there anyone else that you think this Commission should ask to appear here in order to fully explore all of the facts?

No request was made by Nicoletta or his counsel to be present at such interrogation. At that meeting, which occurred on April 16, Chief Destito and six other police officers gave their version of circumstances associated with the fight, and expressed other views as to Nicoletta's stability as a police officer. Shortly thereafter the Commission adopted its Resolution terminating Sergeant Nicoletta's employment.

The Commission minutes of May 9, 1974, disclose a further invitation to counsel to Nicoletta (who appeared with him at this final Commission meeting on the subject) to add any "material which he felt would be useful to the consideration of [the] matter." At that final confrontation, a voluntary resignation of Nicoletta was offered and tentatively accepted by the Commission but was later, on the same day, withdrawn by Nicoletta. The Commission minutes disclose:

Counsel Teltser further informed [the Commission] that Mr. Hickey [Nicoletta's counsel] requested the Commission to accept the resignation of Mr. Nicoletta to save him the embarrassment of a judgment which could be adverse. Counsel Teltser responded that based on his understanding, he predicted the Commission would accept Mr. Nicoletta's resignation, and the Commission would not be inclined to penalize Mr. Nicoletta any more than would naturally occur by merely following the requirements of the Commission to follow normal procedure. * * *

Counsel Teltser stated after approval of the Commission for Mr. Nicoletta to present his letter of resignation, Mr. Hickey, in the

presence of Mr. Nicoletta, informed counsel Teltser they would prepare and return to the Commission within one hour a letter of resignation compatible with the Commission's discussion. Counsel Teltser received a phone call from Mr. Hickey within the hour informing that Mr. Nicoletta had changed his mind and would not submit his resignation nor appear again at the Commission.

## I

## WAS SERGEANT NICOLETTA ENTITLED TO A HEARING?

We shall pass various procedural and other questions involved below, in order to examine the meritorious issue projected by the petition for certification, on the basis of which we agreed to review the case. That is to say: What due process or like right is owing to an employee such as Nicoletta, in the circumstances presented here, incident to the termination of his public employment?

We have seen that such termination need not be predicated on just cause, and accordingly no "property" interest is implicated, such as to invoke the due process shield. *Board of Regents v. Roth,* 408 *U. S.* 564, 92 *S. Ct.* 2701, 33 *L. Ed.* 2d 548 (1972). The "property" interest contemplated by the Fourteenth Amendment may take many forms over and above the ownership of tangible property. *See Fuentes v. Shevin,* 407 *U. S.* 67, 86, 92 *S. Ct.* 1983, 1997, 32 *L. Ed.* 2d 556, 573 (1972); *see generally Reich, The New Property,* 73 *Yale L. J.* 733 (1964). But in this context the key concept is "entitlement," such as involved in statutory eligibility for welfare benefits, *Goldberg v. Kelly,* 397 *U. S.* 254, 90 *S. Ct.* 1011, 25 *L. Ed.* 2d 287 (1970); tenure employment, *Slochower v. Board of Higher Educ.,* 350 *U. S.* 551, 76 *S. Ct.* 637, 100 *L. Ed.* 692 (1956); contractual right to employment, *Wieman v. Updegraff,* 344 *U. S.* 183, 73 *S. Ct.* 215, 97 *L. Ed.* 216 (1952); a clearly implied promise of continued employment, *Connell v. Higginbotham,* 403 *U. S.* 207, 91 *S. Ct.* 1772, 29 *L. Ed.* 2d 418 (1971), or the like. The chief ingredient of this kind of "property" interest such as to quicken the right

to protection by procedural due process is a "legitimate claim of entitlement." *Board of Regents v. Roth, supra,* 408 *U. S.* at 577, 92 *S. Ct.* at 2709, 33 *L. Ed.* 2d at 561. As we have seen, the statute here subjects the duration of employment to the will of the employer and as against the exercise of such will, Nicoletta had no "entitlement" to employment. His status may be analogized to that of the respondent in *Roth*:

[T]he terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it. In these circumstances, the respondent surely had an abstract concern in being rehired but he did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment. [408 *U. S.* at 578, 92 *S. Ct.* at 2710, 33 *L. Ed.* 2d at 561 (emphasis in original) (footnote omitted)].

Nor does the present case involve an attempt to circumvent a constitutional right such as free speech, in which event there might be, as mentioned by Justice Stewart in *Roth,* "a different case." *Perry v. Sindermann,* 408 *U. S.* 593, 92 *S. Ct.* 2694, 33 *L. Ed.* 2d 570 (1972); *Williams v. Civil Service Commission,* 66 *N. J.* 152 (1974). *But see,* where there are multiple causes for dismissal, *Mt. Healthy City Board of Ed. v. Doyle,* 429 *U. S.* 274, 97 *S. Ct.* 568, 50 *L. Ed.* 2d 471 (1977).

A "property" interest aside however, it is asserted that the circumstances of Nicoletta's dismissal involved a "liberty" interest on his part within the intendment of the Fourteenth Amendment. The Supreme Court, as it recalled in *Roth,* "has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." *Board of Regents v. Roth, supra,* 408 *U. S.* at 572, 92 *S. Ct.* at 2706, 33 *L. Ed.* 2d at 558. This "liberty" includes "not merely freedom from bodily

restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of * * * conscience, and generally to enjoy those privileges long recognized * * * as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska,* 262 *U. S.* 390, 399, 43 *S. Ct.* 625, 626, 67 *L. Ed.* 1042, 1045 (1923).

The *Roth* Court distinguished a case which might imperil these rights:

The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau,* 400 *U. S.* 433, 437, 91 *S. Ct.* 507, 27 *L. Ed.* 2d 515, 519. * * * In such a case, due process would accord an opportunity to refute the charge before University officials. In the present case, however, there is no suggestion whatever that the respondent's interest in his "good name, reputation, honor, or integrity" is at stake.

Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would be a different case. For "[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury * * *." *Joint Anti-Fascist Refugee Committee v. McGrath* [341 *U. S.* 123, 185, 71 *S. Ct.* 624, 655, 95 *L. Ed.* 817, 861] (*Jackson,* J., concurring). *See Truax v. Raich,* 239 *U. S.* 33, 41, 36 *S. Ct.* 7, 10, 60 *L. Ed.* 131, 135. The Court has held, for example, that a State, in regulating eligibility for a type of professional employment, cannot foreclose a range of opportunities "in a manner * * * that contravene[s] * * * Due Process," *Schware v. Board of Bar Examiners,* 353 *U. S.* 232, 238, 77 *S. Ct.* 752, 1 *L. Ed.* 2d 796, 801, 64 *A. L. R.* 2d 288, and, specifically, in a manner that denies the right to a full prior hearing. *Willner v. Committee on Character,* 373 *U. S.* 96, 103, 83 *S. Ct.* 1175, 10 *L. Ed.* 2d 224, 229, 2 *A. L. R.* 2d 1254.

[408 *U. S.* at 573–74, 92 *S. Ct.* at 2707, 33 *L. Ed.* 2d at 558–59 (citations & footnote omitted)].

These concepts direct our attention again to *Williams v. Civil Service Commission, supra,* 66 *N. J.* 152, 156–57:

In this State a rule of the Civil Service Commission authorizes the Chief Examiner and Secretary of the Commission, with respect to any applicant who shall at any time theretofore "have been removed * * * from the public service * * *" to do any of the following:

1. Reject the application of a person for admission to an examination;
2. Refuse to test an applicant;
3. Refuse to place the name of a person on the employment list;
4. Refuse to certify the name of an eligible person; or
5. Remove from the employment list the name of an eligible person. [*N. J. A. C.* 4:1–8.14]

Thus removal from the public service — as has occurred to this plaintiff — may indeed have imposed upon him a stigma or potential disability, seriously affecting his liberty to seek future employment in a position which falls within the domain of the civil service regulations.

We do not consider here, for three reasons, the bearing on Nicoletta's reputation of the strong charges of wrongdoing included in the Commission's eventual findings of fact, *supra,* which were filed only in response to the remand direction of the Appellate Division. It cannot be overemphasized that Nicoletta's employment was terminated for "cause," which went to the heart of the responsibilities of a law enforcement official. Thus, in this case, the disclosure of reasons occurred after the termination for cause and the accrual of constitutional injury.

In addition, as perceptively noted in the dissent of our colleague Justice Schreiber, the United States Supreme Court has distinguished between public and private disclosures or nondisclosures of reasons. It stated in *Bishop v. Wood,* 426 *U. S.* 341, 96 *S. Ct.* 2074, 48 *L. Ed.* 2d 684 (1976), that:

In this case the asserted reasons for the City Manager's decision were communicated orally to the petitioner in private and also were

stated in writing in answer to interrogatories after this litigation commenced. Since the former communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his "good name, reputation, honesty, or integrity" was thereby impaired. And since the latter communication was made in the course of a judicial proceeding which did not commence until after petitioner had suffered the injury for which he seeks redress, it surely cannot provide retroactive support for his claim. A contrary evaluation of either explanation would penalize forthright and truthful communication between employer and employee in the former instance, and between litigants in the latter. [*Id.* at 348–49, 96 *S. Ct.* at 2079–80, 48 *L. Ed.* 2d at 692].[3]

Contrary to *Bishop,* where the original firing was allegedly for "no reason" or for reasons which were not disclosed or publicized but only came to light upon the insistence of the employee, in this case the revealment of reasons was elicited in the context of litigation instituted by the employee based on his legitimate assertion of constitutional injury stemming from the original firing for cause.

Third, we agree with Justice Schreiber that the Supreme Court in *Bishop* and *Paul v. Davis,* 424 *U. S.* 693, 96 *S. Ct.* 1155, 47 *L. Ed.* 2d 405 (1976), appears to have receded from the *dictum* of *Roth* concerning the stigmatic legal implications of a discharge for blameworthy cause. In *Paul,* the Court stated:

---

[3]The same opinion comports with our rule in *English, supra,* as follows:

In *Board of Regents v. Roth,* 408 *U. S.* 564, 92 *S. Ct.* 2701, 33 *L. Ed.* 2d 548, we recognized that the nonretention of an untenured college teacher might make him somewhat less attractive to other employers, but nevertheless concluded that it would stretch the concept too far "to suggest that a person is deprived of 'liberty' when he *simply is not rehired in one job but remains as free as before to seek another." Id.,* at 575, 92 *S. Ct.* 2701, 33 *L. Ed.* 2d 548. *This same conclusion applies to the discharge of a public employee whose position is terminable at the will of the employer* ⋆ ⋆ ⋆. [*Bishop v. Wood, supra,* 426 *U. S.* at 348, 96 *S. Ct.* at 2079, 48 *L. Ed.* 2d at 692 (emphasis added)].

While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause. [*Id.* at 701, 96 *S. Ct.* at 1160–61, 47 *L. Ed.* 2d at 414].

It is unnecessary to probe and explore the scope of ambivalence in the treatment of this "reputation-stigma" factor by the United States Supreme Court in *Board of Regents v. Roth, supra; Bishop v. Wood, supra; Paul v. Davis, supra;* and *Wisconsin v. Constantineau,* 400 *U. S.* 433, 91 *S. Ct.* 507, 27 *L. Ed.* 2d 515 (1971). Nor need we determine the applicability of our State constitutional guarantee of due process, which has its source in *N. J. Const.* (1947), Art. I, par. 1; *Township of Montville v. Block 69, Lot 10,* 74 *N. J.* 1 (1977); *Cunningham v. Department of Civil Service,* 69 *N. J.* 13 (1975); or, the firmly-established New Jersey "fairness and rightness" doctrine. *State v. Deatore,* 70 *N. J.* 100, 109–12 (1976); *Donaldson v. Board of Educ.,* 65 *N. J.* 236, 242–43 (1974); *Rodriguez v. Rosenblatt,* 58 *N. J.* 281, 294–96 (1971); *Monks v. Parole Bd.,* 58 *N. J.* 238, 249–50 (1971); *State v. Kunz,* 55 *N. J.* 128, 144 (1969).

For there is a much more narrow, yet palpable, *ratio decidendi* upon which to rest our decision, a ground conspicuously absent in *Roth, Bishop* and *Paul.* In the present case, as in *Williams,* the removal of the employee from public employment *per se* exposed him to potential disqualification from further public employment. As indicated in *Williams, supra,* the source of this disablement is *N. J. A. C.* 4:1–8.14, which provides in pertinent part:

(a) The Chief Examiner and Secretary shall take the following actions for any cause listed in subsection (b) of this Section or for any other good cause:
1. Reject the application of a person for admission to an examination;

2. Refuse to test an applicant;
3. Refuse to place the name of a person on the employment list;
4. Refuse to certify the name of an eligible person; or
5. Remove from the employment list the name of an eligible person.

(b) Any of the following shall constitute good cause for such action by the Chief Examiner and Secretary against any prospective employee who:

\* \* \* \*

6. Has been removed or has resigned not in good standing or has resigned in lieu of removal from the public service, or whose record of employment, public or private, has been unsatisfactory for any reason which casts substantial doubt upon the person's capacity to perform satisfactorily the duties of the position for which the application has been filed or the test held.

\* \* \* \*

[*N. J. A. C.* 4:1–8.14].

No case, including *Bishop* and *Paul,* holds, or even suggests, that the foreclosure from future employment opportunities by operation of state law is less than a protectible liberty interest within the meaning of the Fourteenth Amendment. The fundamental, preliminary point, reiterated recently by the Supreme Court in *Memphis Light, Gas and Water Div. v. Craft,* 436 *U. S.* 1, 9–12, 98 S. Ct. 1554, 1560–61, 56 *L. Ed.* 2d 30, 39–40 (1978), is that the underlying substantive liberty or property interest is defined with reference to state law. In *Williams, supra,* Justice Mountain characterized the disabling consequences of termination from public service. He wrote:

Thus removal from the public service — as has occurred to this plaintiff — may indeed have imposed upon him a stigma or potential disability, seriously affecting his liberty to seek future employment in a position which falls within the domain of the civil service regulations. [66 *N. J.* at 157].

Since Nicoletta has been "removed" from the public service, the Chief Examiner and Secretary of Civil Service now has "good cause" to invoke all the sanctions of *N. J. A. C.* 4:1–8.14(a), including automatic disqualification from future state service.

The essential impetus of *Roth, Paul* and *Bishop* buttresses the conclusion that such a concrete injury is a protectible liberty interest. In *Roth,* the Supreme Court stated that " '[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury * * *.' " 408 *U. S.* at 574, 92 *S. Ct.* at 2707, 33 *L. Ed.* 2d at 599. In *Paul* the Court quoted with approval—indeed, even accentuated—a passage from *Cafeteria Workers v. McElroy,* 367 *U. S.* 886, 81 *S. Ct.* 1743, 6 *L. Ed.* 2d 1230 (1961):

"Finally, it is to be noted that this is not a case where government action has operated to bestow a badge of disloyalty or infamy, *with an attendant foreclosure from other employment opportunity.* See Wieman v. Updegraff, 344 *U. S.* 183, 190–191, 73 *S. Ct.* 215, 97 *L. Ed.* 2d 216; Joint Anti-Fascist Committee v. McGrath, 341 *U. S.* 123, 140–141, 71 *S. Ct.* 624, 95 *L. Ed.* 817. . . ." Id., at 898, 81 *S. Ct.* 1750, 6 *L. Ed.* 2d 1230. (Emphasis supplied.) [*Paul v. Davis, supra,* 424 *U. S.* at 705–06, 96 *S. Ct.* at 1162, 47 *L. Ed.* 2d at 416].

This thought—that the impairment of future employability by operation of state law is a protectible liberty interest— flows logically from other passages in *Paul.* For example, Justice Rehnquist, writing for the majority, quoted approvingly from *Board of Regents v. Roth, supra*:

"Similarly, there is no suggestion that the State, *in declining to re-employ the respondent,* imposed on him a stigma or other disability that *foreclosed his freedom to take advantage of other employment opportunities.*" Id., at 573, 92 *S. Ct.* 2701, 33 *L. Ed.* 2d 548. [*Paul v. Davis, supra,* 424 *U. S.* at 709–10, 96 *S. Ct.* at 1164, 47 *L. Ed.* 2d at 419 (some emphasis in original)].

In view of these precedents, it is apparent that any eviscerating influences on the *Roth* "reputation" theme in no way affect the continued vitality of the principal thrust of *Williams, supra,* that is, its basic concern with the mentioned disabilities applicable to a person "removed * * * from the public service * * *" as Nicoletta has been. In such

case it is clear that a Fourteenth Amendment "liberty" interest was implicated in the termination of his employment. It is readily deducible that had such a future disqualification factor existed in the *Bishop* and *Paul* cases by operation of state law, and certainly in *Roth,* those courts would have perceived and enforced due process rights on the part of the employee. In any case, the "liberty" interest which we have identified impels us now to an inquiry as to the nature of the "due process" or like right involved, and whether in connection with his ouster Nicoletta received the benefit of such right or anything reasonably equivalent to it.

## II.

### DID SERGEANT NICOLETTA RECEIVE A HEARING COMPORTING WITH DUE PROCESS REQUIREMENTS?

In *Fuentes v. Shevin, supra,* 407 *U. S.* at 80, 92 *S. Ct.* at 1994, 32 *L. Ed.* 2d at 569, the Supreme Court, quoting from *Baldwin v. Hale,* 68 *U. S.* (1 Wall.) 223, 233, 17 *L. Ed.* 531, 534 (1864), asserted:

For more than a century the central meaning of procedural due process has been clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified."

The first prerequisite then of due process is fair notice, *Avant v. Clifford,* 67 *N. J.* 496, 525 (1975), so that a response can be prepared and the respondent fairly heard. As stated by Judge Goldmann in *Department of Law and Public Safety v. Miller,* 115 *N. J. Super.* 122, 126 (App. Div. 1971):

Adequate notice and an opportunity to prepare remains the key to proper administrative proceedings. * * * There can be no adequate preparation where the notice does not reasonably apprise the party of the charges, or where the issues litigated at the hearing differ substantially from those outlined in the notice. It offends elemental concepts of procedural due process to grant enforcement to a finding neither charged in the complaint nor litigated at the hearing.

In *Green v. McElroy,* 360 *U. S.* 474, 496, 79 *S. Ct.* 1400, 1413, 3 *L. Ed.* 2d 1377, 1390–91 (1959), the Supreme Court averred that:

Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.

■ There is little if any contrariety of view as to the requirement of specific and informative notice of the substance of the issue to be heard and decided. And we need not labor the point that the letter to Nicoletta, failing to notify him of the real charge against him, that of instigating the fight, and failing also to advise him of any of the other matters to be investigated at the "hearing" was totally deficient as measured by due process notice requirements. That deficiency was such, in the narrow circumstances of this case, as to render both conferences ("hearings") quite meaningless.

Nor need we pause here to discuss the impartiality of the hearing tribunal (in this case several members of the Commission) except to note that such hearers, in order to be "neutral and detached," need not be disassociated from the administrative process. Monitored by other safeguards which we shall mention, we sense no "hazard of arbitrary decisionmaking [which would] be held violative of due process." *Wolff v. McDonnell,* 418 *U. S.* 539, 571, 94 *S. Ct.* 2963, 2982, 41 *L. Ed.* 2d 935, 959–60 (1974). In *Williams, supra,* Justice Mountain, in a comparable case, saw minimal danger of injustice resulting from possible bias on the part of the employer-hearer, and said "such injustice could be readily corrected by resort to the courts." 66 *N. J.* at 160.

The phrase "some kind of hearing" used by the Supreme Court in *Roth, supra,* 408 *U. S.* at 570 n. 7, 92 *S. Ct.* at 2705, 33 *L. Ed.* 2d at 556, and by Justice White in *Wolff v. McDonnell, supra,* 418 *U. S.* at 557, 94 *S. Ct.* at 2975, 41 *L. Ed.*

2d at 952, was selected by Judge Henry J. Friendly as the title for his Owen J. Roberts Memorial Lecture, 123 *U. Pa. L. Rev.* 1267 (1975). He outlined some of the important elements of a fair hearing including (1) an unbiased tribunal, (2) notice of the proposed action and grounds asserted for it, (3) an opportunity to present reasons why the proposed action should not be taken, (4) the rights to call witnesses, to know the evidence against one, and to have decisions based only on the evidence presented, (5) counsel, (6) the making of a record and a statement of reasons, (7) public attendance and (8) judicial review. *Id.* at 1277–95. He noted that these factors are listed roughly in order of importance and that all of them may not be necessary in any given hearing; he added that "if an agency chooses to go further than is constitutionally demanded with respect to one item, this may afford good reason for diminishing or even eliminating another." *Id.* at 1279.

We remember that at least one of these requisites— public attendance—has been rejected by our Court in a similar proceeding due to the confidentiality of police information and other factors noted by Justice Sullivan in *Kelly v. Sterr,* 62 *N. J.* 105, *cert.* den., 414 *U. S.* 822, 94 *S. Ct.* 122, 38 *L. Ed.* 2d 55 (1973). We specifically affirm this holding in application to the present case.

[8] As to the hearing itself, fairness and not rigid formality should be the touchstone. "[F]ormality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings," *Boddie v. Connecticut,* 401 *U. S.* 371, 378, 91 *S. Ct.* 780, 786, 28 *L. Ed.* 2d 113, 119 (1971), the goal being to minimize the possibility of error or injustice, rectifiable in any case by subsequent judicial review. *See Mathews v. Eldridge,* 424 *U. S.* 319, 96 *S. Ct.* 893, 47 *L. Ed.* 2d 18 (1976).

In examining the components of a fair hearing under due process norms, in a case such as the present one, we adopt the philosophy and manner of its implementation

stated by the United States Supreme Court in *Morrissey v. Brewer*, 408 *U. S.* 471, 92 *S. Ct.* 2593, 33 *L. Ed.* 2d 484 (1972). In that parole revocation case, the Court held:

Once it is determined that due process applies, the question remains what process is due. It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands. "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 *U. S.* 886, 895, 81 *S. Ct.* 1743, 1748, 6 *L. Ed.* 2d 1230, 1236 (1961). * * * Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure. [408 *U. S.* at 481, 92 *S. Ct.* at 2600, 33 *L. Ed.* 2d at 494].

* * * *

What is needed is an informal hearing structured to assure that the finding * * * will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the * * * behavior.

We now turn to the nature of the process that is due, bearing in mind that the interest of [the parties] will be furthered by an effective but informal hearing. [408 *U. S.* at 484–85, 92 *S. Ct.* at 2602, 33 *L. Ed.* 2d at 496].

* * * *

Our task is limited to deciding the minimum requirements of due process. They include (a) written notice of the claimed violations * * * ; (b) disclosure * * * of evidence * * * ; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation) ; (e) a "neutral and detached" hearing body * * * members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons [for acting]. [408 *U. S.* at 488–89, 92 *S. Ct.* at 2604, 33 *L. Ed.* 2d at 498–99].

The *Morrissey* Court emphasized that there was "no thought to equate this [procedural pattern] to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including let-

ters, affidavits, and other material that would not be admissible in an adversary criminal trial." 408 *U. S.* at 489, 92 *S. Ct.* at 2604, 33 *L. Ed.* 2d at 499. Yet fair precision, in the statement of judgment and the reasons therefor, was called for by *Morrissey*:

> The hearing officer shall have the duty of making a summary, or digest, of what occurs at the hearing * * * and the substance of the documents or evidence given * * *. * * * As in *Goldberg* [*Goldberg v. Kelly, supra*], "the decision maker should state the reasons for his determination and indicate the evidence he relied on * * *." [408 *U. S.* at 487, 92 *S. Ct.* at 2603, 33 *L. Ed.* 2d at 498].

While it is probable that governmental exigencies in many circumstances would justify the limiting of formal and time-consuming cross-examination of witnesses by counsel, *vis-a-vis* informal questioning or pointing out of factual arguments *(Wolff v. McDonnell, supra)*, there should generally be permitted the presence of the accused and a right on his part to present evidence, to be advised by counsel, if he chooses, to confront those accusing him and to expect a written statement by the fact-finder as to the findings from the evidence and the judgment based thereon.

These fundamentals are particularly necessary for effective judicial review, an important component of due process.

## III.

### THE REMEDY

Anent the remedy here sought, it is clear to us that by force of the statute, and the legislative intention to vest broad power in the Commission to terminate employment of an officer *(N. J. S. A.* 58:5A–2), there is no residue of power in this Court to overrule the Commission's decision on the merits (absent contamination by constitutional violation or like fault) no matter how abruptly it was made, such as by reinstating Nicoletta to his position. And considering his claim to award of back pay as a species of damages (uncon-

nected with restoration to employment) on the basis of the interim deprivation of his constitutional right to procedural due process, here too we cannot grant such relief, at least in the absence of proof that such deprivation was maliciously intended or with "such disregard of * * * clearly established constitutional rights that [the] action cannot reasonably be characterized as being in good faith." *Wood v. Strickland,* 420 *U. S.* 308, 322, 95 *S. Ct.* 992, 1001, 43 *L. Ed.* 2d 214, 225 (1975). We are not called upon here to determine whether, in the presence of such invidious factors, the converse would be true.

In view of the recent decision of the United States Supreme Court in *Carey v. Piphus,* 435 *U. S.* 247, 98 *S. Ct.* 1042, 55 *L. Ed.* 2d 252 (1978), however, we should make an additional comment. There nominal damages, at least, were said to be justified in an action brought under 42 *U. S. C.* § 1983 where, in a pupil-school suspension case, procedural due process was withheld in violation of known and clearly established due process rights. *Carey v. Piphus, supra,* 435 *U. S.* at 251 n. 6, 98 *S. Ct.* at 1042, 55 *L. Ed.* 2d at 252. *Cf. Goss v. Lopez,* 419 *U. S.* 565, 95 *S. Ct.* 729, 42 *L. Ed.* 2d 725 (1975); *Linwood v. Board of Educ.,* 463 *F.* 2d 763 (7th Cir.), *cert. den.,* 409 *U. S.* 1027, 93 *S. Ct.* 475, 34 *L. Ed.* 2d 320 (1972). We recognize that we are not dealing here with a § 1983 case, but even if we were, the basis for such a damage remedy would not exist. We are not aware of any precedent in New Jersey law (except *Williams, supra,* a comparatively recent decision) linking the termination of a public employment which is terminable at will with the need for procedural due process in the form of notice and hearing. This according to the course of the common law restated by our Court as recently as in *English, supra.* The notice deficiency in Nicoletta's due process right could hardly, therefore, be said to meet the *scienter* norms of *Carey, supra.* As the Supreme Court has held, executive officers are entitled to immunity where they act in good faith, as defined by the Court:

"[I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Scheuer v. Rhodes*, 416 *U. S.* 232, 247–248, 94 *S. Ct.* 1683, 40 *L. Ed.* 2d 90 (1974).

Common-law tradition, recognized in our prior decisions, and strong public-policy reasons also lead to a construction of § 1983 extending a qualified good-faith immunity to school board members from liability for damages under that section. Although there have been differing emphases and formulations of the common-law immunity of public school officials in case of student expulsion or suspension, state courts have generally recognized that such officers should be protected from tort liability under state law for all good-faith, nonmalicious action taken to fulfill their official duties. [*Wood v. Strickland*, 420 *U. S.* 308, 318, 95 *S. Ct.* 992, 999, 43 *L. Ed.* 2d 214, 222–23 (1975)].

■ We note that such qualified immunity of a public body is concordant with New Jersey legislative policy as expressed in our Tort Claims Act:

59:2–3. Discretionary activities
(a) A public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity;
(b) A public entity is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature. * * *

■ We determine that for vindication of his constitutional "liberty" right, Sergeant Nicoletta is only entitled, if he wishes it, to a post-termination hearing not so much for the limited purpose described by Justice Mountain in *Williams, supra* — "to clear any damage to his reputation," but rather to attempt to dislodge the specter of possible Civil Service debarment from further public employment. He would thus have opportunity to try to persuade the Commission, in its basic discretion nevertheless (*N. J. S. A.*

58:5A–2), to change its determination as to his ouster. As we have seen, it must not be supposed that this Court, in these circumstances, has authority to reinstate him to his position or award back pay. These decisions inhere in the Commission under the statute. Inasmuch as Nicoletta had no "property" interest that was taken from him and his dismissal, even without cause, was within the statutory province of the Commission, it is only the loss of his "liberty" interest which was implicated in the due process deficiency, and it is only the due process right related to that interest which can be restored to him by the power of this Court. As stated by the Supreme Court in *Roth, supra*:

> The purpose of such notice and hearing is to provide the person an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment for other reasons. [408 *U. S.* at 573 n. 12, 92 *S. Ct.* at 2707, 33 *L. Ed.* 2d at 558–59].

In the circumstances of this case, bearing in mind the Supreme Court's softening of the effect of the *Roth* "reputation-stigma" factor, this quoted expression could be read to substitute (for the thrust of such opportunity to "clear his name") the expression "to contest the basis upon which his discharge and resulting potential employment disqualification would rest."

Such was the sense of the Law Division holding in a comparable case, *Campbell v. Atlantic Cty. Bd. of Freeholders*, 145 *N. J. Super.* 316 (1976). A Board of Freeholders had terminated and thus "removed from the public service," without prior notice or hearing, a non-tenured, "at will" employee (because of his indictment for a criminal offense, of which he was later acquitted). The Law Division identified a "liberty" interest right to procedural due process, as we do here. The sole remedy offered was described by that court:

> An appropriate and adequate hearing as to the relevance of plaintiff's discharge under *N. J. A. C.* 4:1–8.14 may be conducted before

this court. For that purpose * * * the court retains jurisdiction. A full evidentiary hearing may be held, at plaintiff's option, to establish the circumstances of his removal from the public service and their relevance to the application of *N. J. A. C.* 4:1–8.14. In all other respects plaintiff's claims are rejected. [145 *N. J. Super.* at 330].

The Appellate Division only recently affirmed this decision, 158 *N. J. Super.* 14 (App. Div. 1978), particularly noting that "plaintiff still has available to him, at his option, a full evidentiary hearing before the trial court" for the purposes outlined by that court.

We assume that these courts did not intend the term "full evidentiary hearing" to extend beyond that type described in *Morrissey v. Brewer, supra,* which we have decided to be sufficient to accommodate the needs of government to operate efficiently, yet fully acquit the constitutional right under discussion.

Further, we believe and decide that such hearing should not, at least where the employer is *in esse,* be before the court but rather (in a non-civil service case) before the employer, as in *Williams, supra.* This for at least two principal reasons:

1. The post-termination hearing is designed to restore to the employee as nearly as possible the procedural right of which he was deprived, a hearing, albeit a pre-termination hearing, before his employer.

2. The decision as to termination or, if the employer should reverse its decision at the hearing, to permit resumption of the employment, should be that of the employer and not of the court. This comports with the firmly established principle that issues within the bailiwick and expertise of an administrative agency should be adjudicated in the first instance by the agency, subject to judicial review. *Cf. Division 540, Amalgamated Transit Union, AFL-CIO v. Mercer County Improvement Auth.,* 76 *N. J.* 245 (1978) (judicial review of arbitrator's award).

More practically, the courts of New Jersey under present circumstances are in no position to assume additional burdens where constitutional or other rights may be sufficiently

protected in another tribunal by adherence to fair procedural rules. Not only are the courts reeling under their present obligations but face new ones, which should not be needlessly or gratuitously augmented.[4]

After the fair hearing, before his employer, to which Sergeant Nicoletta is entitled, the Commission is free to reaffirm or not its prior decision, in conformity with its statutory power. The hearing which we order is the only "just and proper" relief that can be afforded by this Court under its constitutional authority.

Reversed.

PASHMAN, J., concurring. I join fully in the well-reasoned analysis of the Chief Justice's opinion for the Court which clearly establishes plaintiff's entitlement to, and non-receipt of, procedural due process in the dismissal proceedings below. Plaintiff's dismissal from public service implicated his constitutionally protected "liberty" interest and obligated his governmental employer to afford him the safeguards of procedural due process in effecting the termination of his

---

[4]The litigation backlog has increased by some 16,000 cases or 10.8 percent, in the last year, to an all-time high of 169,994 cases presently facing us. With respect to new duties, the Child Placement Review Act signed by the Acting Governor on February 27, 1978, and now L. 1977, c. 424, will invoke court review annually of more than 16,000 cases of foster child placement and the like. Again, particularly because of Title IV–D of the Social Security Act, § 451, 42 U. S. C. § 651 (Supp. V 1975), our courts must supervise family support orders and their enforcement, numbering over 103,000 cases in a recent court year. Other new and oncoming obligations threaten the capacity of the courts for the administration of justice. It is to be hoped that a full computer capacity will, in due time, be provided the courts to cope wtih their mounting obligations. But in the meanwhile, the administration of justice is weakening, such as by occasional need to completely shut down the civil calendars in favor of expediting, for the public security, the trial of serious criminal cases. It is therefore on the basis of prudential considerations that we must, where that choice exists, reject additional burdens upon court time.

employment. I write separately in an attempt to clarify the rights and duties of governmental employers *vis-a-vis* their nontenured employees in this context and to note my concern over certain observations made in Part III of the majority opinion which take a rather grudging view of this Court's power to review the personnel actions of the Commission.

I

In the absence of any reasonable employee expectancy of continued employment, derived from law, regulation, contract or practice, a governmental employer has a relatively free rein with respect to the termination of an employee. And undeniably not all reasons for the discontinuance of employment implicate such an employee's liberty interest as that concept has been defined by this Court and the United States Supreme Court. *See Williams v. Civil Service Commission,* 66 *N. J.* 152, 156–157 (1974) ; *Board of Regents v. Roth,* 408 *U. S.* 564, 573–575 (1972). Illustrative of these reasons is the case where an employee is hired for a specific limited period and is terminated simply because that period has expired. *See Board of Regents v. Roth, supra.* However, in the case of a termination precipitated by the alleged misconduct or unsatisfactory performance of the employee which will be disseminated to the extent that the employee's prospects for future employment could be impaired, the employee's constitutional entitlement to notice and "some kind of hearing" comes into play.[1] This hearing

---

[1] I do not understand the Court's references to *Bishop v. Wood,* 425 *U. S.* 34, 96 *S. Ct.* 1281, 47 *L. Ed.* 2d 556 (1976), and *Paul v. Davis,* 424 *U. S.* 693, 96 *S. Ct.* 1155, 47 *L. Ed.* 2d 405 (1976), see *ante* at 157–162, to indicate its approval of the rationale of those cases, aptly described by Justice Brennan in dissent as "overtly hostile to the basic constitutional safeguards of the Due Process Clauses of the Fifth and Fourteenth Amendments * * *." *Bishop v. Wood, supra,* 426 *U. S.* at 361, 96 *S. Ct.* at 2085 (Brennan, J., dissenting). As the Chief Justice correctly points out, in New Jer-

provides him with the appropriate opportunity to protect himself against being "wrongfully stigmatized" by spurious accusations of impropriety. Governmental employment may not be terminated on grounds of misconduct without fundamentally fair procedures to determine whether the misconduct has in fact occurred, as constitutional due process

sey, as a result of Civil Service regulation (*N. J. A. C.* 4:1–8.14), see *ante* at 159–160, the effect of the mere fact of an employee's dismissal from governmental service on his prospects for future employment in the public sector will automatically satisfy even the Supreme Court's narrow definition of the liberty interest protected by the federal constitution. See *ante* at 159–162. The dissent's claim, see *post* at 189–190 that the disability resulting from this regulation is inapplicable to plaintiff because his employment was not subject to Civil Service seems unwarranted in view of the absence of any limitation on the definition of "public service" as used in *N. J. A. C.* 4:1–8.14(b)(6) to the "classified" public service. We thus need not consider the impact of the *fact* of such a dismissal on future employment prospects in the private sector or of the potential stigma (including injury to reputation) flowing from the *reasons* for the dismissal in assessing whether plaintiff's liberty interest has been infringed.

With respect to *Bishop v. Wood's* narrowing of the circumstances in which a discharge for a blameworthy cause may be found to have stigmatic legal implications which infringe on an employee's protected liberty interest, I disagree with the disingenuous reasoning of the Supreme Court on the federal constitutional issue. As tellingly observed by Justice Brennan, in *Bishop*, the Court

* * * effectively destroy[ed] even that last vestige of protection for "liberty" by holding that a State may tell an employee that he is being fired for some nonderogatory reason, and then turn around and inform prospective employers that the employee was in fact discharged for a stigmatizing reason that will effectively preclude future employment.

[426 *U. S.* at 351–352, 96 *S. Ct.* at 2080 (Brennan, J., dissenting)]

A pre-*Bishop v. Wood* commentator has succinctly noted the damage to an individual's future employment opportunities created by *any* dismissal from public employment for failure to render satisfactory or acceptable service:

* * * The standards for satisfactory government service are not extraordinarily high and failure to meet them for whatever reason carries heavy overtones of incompetence. Moreover, all reasons for such dismissals, whether publicized or not, tend to find

forbids arbitrary deprivations of liberty. *Cf. Goss v. Lopez,* 419 *U. S.* 565, 574, 95 *S. Ct.* 729, 42 *L. Ed.* 2d 725 (1975).

Of course, the employee's attempt may well prove unsuccessful, with the hearing resulting in the sustaining of the termination and affirmance of the reasons therefor. There is no constitutional proscription of a termination whose bases might ultimately have a detrimental effect on the employee's subsequent career. As the Supreme Court has observed in another context, "[p]rocedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus,* 435 *U. S.* 247, 98 *S. Ct.* 1042, 1050, 55 *L. Ed.* 2d 252, 262 (1978). In other words, the hearing may establish that the deprivation of liberty occasioned by the dismissal is warranted because the charges against the employee are valid. The constitutional command is only that no such termination may be accomplished without a hearing at which the employee may attempt to dissuade the employer from discharging him (either by showing lack of culpability or circumstances warranting a reduction in the

---

their way into data banks. It is unrealistic to blink at the serious, perhaps insuperable, difficulties that a dismissed public employee may experience in finding alternate employment, due merely to the fact that he has been fired by the government.
> [R. Johnson, "Probationary Government Employees and the Dilemma of Arbitrary Dismissals," 44 *Univ. of Cincinnati L. Rev.* 698, 712–713 (1975) (footnotes omitted)]

Where an employee is dismissed for a more blameworthy reason, such as misconduct, the damage to his prospects for future employment is necessarily magnified greatly. Unless any publication of the reason for dismissal is to be prohibited, a rather unlikely eventuality at best, it borders on the absurd to believe that the mere fact of nonpublication at the precise time of the termination means that the dismissal cannot detrimentally affect the employee's prospects for future employment. The ultimate touchstone for finding an infringement of liberty must be the potential negative impact of the termination of governmental employment on future employability, whether that impact results from the fact of dismissal alone or from the underlying reasons therefor.

disciplinary sanction) or, failing that, to convince the employer to mitigate the potentially harmful consequences of the termination by formally modifying the official record of its basis from a stigmatizing to some nonderogatory reason. See generally *Codd v. Velger*, 429 *U. S.* 624, 633–34, 97 *S. Ct.* 882, 51 *L. Ed.* 2d 92 (Stevens, J., dissenting).[2]

In a case such as that before us, the better practice would be for the governmental employer to provide the employee with notice of the charges against him and of its intent to take adverse action against him. The notice should also, in effect, order him to show cause at a hearing to be held a reasonable time thereafter why his employment should not be terminated for the reasons specified in the notice. Where the governmental employer has reasonable cause to believe that the employee is guilty of misconduct which, if proven, would justify his dismissal, the employer may appropriately impose a disciplinary suspension with or without pay pending the termination hearing. After the hearing, the decision-making authority will make its determination as to whether the proposed termination for the reasons specified is sus-

---

[2]The dissent relies on the *Codd* majority's *dictum* that the sole purpose of the termination hearing is to provide an opportunity for the stigmatized employee to vindicate his name, see *post* at 193, for its conclusion that refutation of the charges underlying the termination and mitigation of the sanction are issues not cognizable at the hearing. However, it is noteworthy that Justice Stevens, the author of *Bishop v. Wood, supra*, dissented in *Codd*. He observed that in neither *Roth, supra*, nor *Bishop* did the Supreme Court "state or imply that a name-clearing hearing was the *only* remedy mandated by the Constitution." 429 *U. S.* at 634 n. 6, 97 *S. Ct.* 882, 888. As he cogently demonstrates, under *Roth* the name-clearing hearing may be sufficient where only the reputational injury aspect of the employee's protected liberty interest is implicated. However, even assuming that a hearing of such a limited scope would satisfy due process standards in the reputational context, where an employee's future employability may be adversely affected by the stigmatization incident to his dismissal from public employment, due process requires a hearing of broader scope before such a deprivation of his liberty may be imposed. *See* 429 *U. S.* at 633 n. 3, 97 *S. Ct.* 882.

tained.[3] While a post-termination hearing to determine whether the dismissal will be upheld passes constitutional muster, a pre-termination hearing is much preferable. There the employee is not faced with a *fait accompli* and will not be confronted with the difficult task of overcoming the psychological resistance inherent in an attempt to upset a decision already made.

I agree with the Court's refusal to direct that plaintiff be reinstated with back pay. Nicoletta was deprived of his constitutional right to procedural due process in his dismissal from employment. Nevertheless, the situation in this case is to be distinguished from the constitutional violation occurring when the termination of a governmental employee is predicated upon his exercise of constitutionally protected rights. In such a case, it is the governmental employer's *reason* for, rather than its method of, terminating the employee which is constitutionally invalid. *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 *U. S.* 274, 283, 97 *S. Ct.* 568, 50 *L. Ed.* 2d 471 (1977) ; *Perry v. Sindermann,* 408 *U. S.* 593, 597–598, 92 *S. Ct.* 2694, 33 *L. Ed.* 2d 570 (1972) ; *Pickering v. Bd. of Ed.,* 391 *U. S.* 563, 568, 88 *S. Ct.* 1731, 20 *L. Ed.* 2d 811 (1968) ; *English v. College of Medicine and Dentistry of New Jersey,* 73 *N. J.* 20, 23 (1977) ; *Williams v. Civil Service Commission, supra,* 66 *N. J.* at 157–158; *Donaldson v. Bd. of Ed. of No. Wildwood,* 65 *N. J.* 236, 242 (1974) ; *Winston v. Bd. of Ed. of So. Plainfield,* 64

---

[3]An employee suspended without pay pending a hearing who exonerates himself at his hearing should receive back pay to the date of his suspension in addition to being reinstated if he can show that his employer lacked reasonable cause to believe that he was guilty of dischargeable conduct at the time of his suspension. Under these circumstances, suspension without pay is arbitrary. However, since I would assume that governmental employers normally would not impose so severe a sanction as a suspension without pay in the absence of a reasonable, good faith belief of the employee's culpability, the occasions where an ultimately exonerated employee receives back pay for the period of his improper suspension should be rare.

*N. J.* 582 (1974); *Burlington County Evergreen Park Mental Hosp. v. Cooper,* 56 *N. J.* 579, 583 (1970); *Endress v. Brookdale Community College,* 144 *N. J. Super.* 109, 130 (App. Div. 1976). As the Supreme Court stated in *Perry v. Sindermann, supra:*

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable government benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — especially, his interest in freedom of speech. * * *
>
> [408 *U. S.* at 597, 92 *S. Ct.* at 2697]

This limitation on the powers of a governmental employer exists irrespective of the employment status of the employee. In *Mt. Healthy City Bd. of Ed. v. Doyle, supra,* Justice Rehnquist recognized that an employee's constitutional claims are not defeated by his lack of tenured status:

> * * * Even though he could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the decision not to rehire him, * * * he may nonetheless establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms.
>
> [429 *U. S.* at 283–284, 97 *S. Ct.* at 574 (citations omitted)]

Where the dismissal of an employee is in retaliation for constitutionally protected activity, the termination is *void ab initio* and the employee is entitled to reinstatement with back pay to the date of the illegal discharge in order to remedy the infringement of his substantive constitutional rights. Restoring the *status quo ante* by making the employee whole is necessary since the employee could not have been validly terminated in the first place.

However, in the instant case, it is the method by which Nicoletta's termination was effected which is constitutionally

defective, since his dismissal from public service triggered his constitutional right to procedural due process and he did not receive the required hearing. The substantive basis of his termination, if factually supported, was clearly valid. In contrast to the case where the discharge is illegal on its merits, a termination which is only procedurally defective requires a remedy appropriate to the less egregious nature of the constitutional violation. The constitutional violation in such a case, namely, the failure to accord procedural due process, is not the cause of the termination, as it is in the retaliatory discharge situation. Where the only injury suffered has been the denial of a termination hearing, automatically ordering back pay for an employee whose procedurally defective termination might be proven to have been substantively justified would be tantamount to a windfall. *Cf. Carey v. Piphus, supra,* 435 *U. S.* at 260, 98 *S. Ct.* at 1051, 55 *L. Ed.* 2d at 263.[4] The appropriate remedy is to direct that the employee be made whole by receiving the hearing to which he was entitled in the first place. Since even after a proper hearing is held the original termination may stand, if the factual justification therefor is established, ordering the employee's reinstatement pending the hearing would make him more than whole.[5] The employee is en-

---

[4]The availability, as a result of *Carey*, in a federal civil rights action of nominal damages as a remedy for a denial of procedural due process, see *ante* at 167, is irrelevant to the issue of the type of relief warranted in direct appeal from the action of a governmental body in dismissing an employee. I intimate no view, nor do I understand the Court to, as to whether the limitation imposed by *Carey* on the redress available for such federal constitutional violations has any effect on the at-times more solicitous protection afforded by our own constitution.

[5]The situation may differ in a case where the employer could not have received a disciplinary suspension pending a termination hearing. In view of the broad grant of power accorded the governmental employer by the statute herein, it would seem that the power to suspend an employee prior to termination is encompassed therein.

titled to receive the remedy which will cure the constitutional deprivation he has suffered and no more. Assuring that the employee is provided with the constitutionally mandated termination hearing does exactly that.

## II

However, I am troubled by the implications of the Court's rather circumscribed view of the potential results of the hearing it grants plaintiff. See *ante* at 171. The Court may be construed as suggesting that even if plaintiff is able to totally invalidate the factual predicate of his discharge, so that the Commission could have no basis for reaffirming its prior decision to dismiss him for that particular reason, the Commission can nevertheless decide to terminate his employment for no reason at all in the exercise of its discretion under *N. J. S. A.* 58:5A–2. I believe that according the Commission such broad power over its employees would permit arbitrary action by that governmental agency and could deny plaintiff and other employees of the Commission *substantive* due process. Although the issue is not directly presented in this appeal, I am constrained to comment upon it.

Admittedly, *N. J. S. A.* 58:5A–2 confers broad powers on the Commission with respect to the employment of its police force, providing, in pertinent part, that the Commission "shall have sole control" of all employment matters. The Court interprets this statute as granting the Commission the right to terminate plaintiff's employment with or without cause, see *ante* at 150, citing our recent decision in *English v. College of Medicine and Dentistry, supra.* However, this broad grant of power, which concededly greatly narrows the scope of judicial review of the merits of the Commission's personnel decisions, is not absolute. As the Court recognizes, termination for an illegal reason, such as the exercise of First Amendment rights, would not be countenanced. See *ante* at 155–156. Moreover, even in the case of private employers, who are generally not subject to the constitutional constraints

binding governmental employers, the purportedly untrammeled right to terminate without cause is qualified by numerous statutory restrictions on the reasons for employee discharge. *See, e. g., N. J. S. A.* 34:15–39.1 (unlawful to discharge employee claiming worker's compensation benefits); *N. J. S. A.* 10:5–12(d) (unlawful to take reprisals against any person who has filed a complaint with the Division on Civil Rights); 42 *U. S. C.* § 2000e–3 (unlawful employment practice for an employer to discriminate against any employee who has filed a discrimination charge with the Equal Employment Opportunity Commission); 29 *U. S. C.* § 158 (a)(3) and (4) (unfair labor practice for employer to discriminate against an employee because of union activities or of his filing an unfair labor practice charge with the National Labor Relations Board). *See also Cooper v. Nutley Sun Printing Co., Inc.,* 36 *N. J.* 189, 197 (1961) (*N. J. Const.* (1947), Art. I, para. 19, prevents private employers from discharging employees for collective organizational activities). In my view, with respect to a governmental employer, the right to discharge is further qualified by the prohibition of any termination of employment for an arbitrary and capricious reason, even where no liberty interest is implicated.

The principle that governmental entities may act only in a manner consistent with due process is fundamental in our democratic system. In its affirmative formulation, this constitutional guarantee requires that all governmental action be rationally related to the furtherance of a legitimate governmental objective. While the mandate that governmental action have a rational basis may not, in the instant context, rise to the level of a rule that the termination of governmental employment may be based only upon good cause, it surely requires that the basis for such governmental action be something more than "no cause." The Commission's "sole control" over the employment of its police must be construed as being subject to the implied qualification that no termination may be based on an irrational cause. As eloquently stated by Justice Marshall:

The prior decisions of this Court * * * establish a principle that is as obvious as it is compelling — *i. e.*, federal and state governments and governmental agencies are restrained by the Constitution from acting arbitrarily with respect to employment opportunities that they either offer or control. Hence, it is now firmly established that whether or not a private employer is free to act capriciously or unreasonably with respect to employment practices, at least absent statutory or contractual controls, a government employer is different. The government may only act fairly and reasonably.

> [*Board of Regents v. Roth, supra,* 408 *U. S.* at 588, 92 *S. Ct.* at 2714 (Marshall, J., dissenting) (footnotes omitted)]

*See Arnett v. Kennedy,* 416 *U. S.* 134, 183, 94 *S. Ct.* 1633, 40 *L. Ed.* 2d 15 (1974) (White, J., concurring in part, dissenting in part); *Cafeteria Workers v. McElroy,* 367 *U. S.* 886, 898, 81 *S. Ct.* 1743, 6 *L. Ed.* 2d 1230 (1961); *Slochower v. Bd. of Ed.,* 350 *U. S.* 551, 556, 76 *S. Ct.* 637, 100 *L. Ed.* 692 (1956); *Wieman v. Updegraff,* 344 *U. S.* 183, 192, 73 *S. Ct.* 215, 97 *L. Ed.* 216 (1952). Indeed, absent such a limitation on the Commission's authority, substantial questions concerning the constitutional permissibility of such an unrestricted delegation of legislative power would be raised.

Although this intermediate standard is difficult to articulate with precision, it at least requires that no governmental employee may be validly terminated for a reason that lacks any rational connection to his employment.[6] The late Chief Justice Weintraub grappled with this same problem in his opinion in *Zimmerman v. Bd. of Ed. of Newark,* 38 *N. J.* 65 (1962):

The Legislature intended wide latitude in the employing authority to determine fitness for permanent employment. It is clear that

---

[6]Unlike my dissenting brethren, see *post* at 195 n. 6, I do not equate the absence of a requirement that the discharge of an at-will governmental employee be predicated upon just cause with an affirmative holding that such an employee may be discharged "for any reason."

public employment may not be refused upon a basis which would violate any express statutory or constitutional policy. A simple example would be discrimination for race or religion. But I am not sure such specific limitations are the only restraints. If the employing agency, for an absurd example, thought blondes were intrinsically too frivolous for permanent employment, a court would find it difficult to withhold its hand.

But if we may inquire into "unreasonableness," it would seem to follow that there must be a "reason," i. e., "cause" for refusal to continue the teacher into a tenure status. That course has its difficulties. It would not mean the court would not recognize a wide range of "reasons" or would lightly disagree with the employer's finding that the "reason" in fact existed. But it would follow that upon demand the teacher would be entitled to a statement of the grounds, with the right to a hearing and to a review as to whether the grounds are arbitrary in nature or devoid of factual support.
[38 N. J. at 80 (Weintraub, C. J., concurring) (citations omitted)]

It would not seem open to serious dispute that where the actual basis of an employee's termination is a reason wholly irrelevant to his employment, such as, for example, the mere whim of his superiors, the governmental employer has violated that employee's constitutional right to be free from arbitrary and capricious governmental action. This interest is as much the subject of constitutional protection as its more famous constitutional brethren. A non-policymaking, non-confidential governmental employee cannot, consistent with due process, be discharged from a job that he is satisfactorily performing solely for such an arbitrary reason. Cf. Elrod v. Burns, 427 U. S. 347, 375, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (Stewart, J., concurring). Accordingly, in my view the Commission's discretionary authority is not unrestricted and its personnel actions may be set aside if they are shown to be arbitrary, capricious or otherwise oppressive. As is the case with the other situations where the reason for termination is itself constitutionally proscribed, an employee so terminated is entitled to reinstatement with back pay to remedy his constitutional deprivation.

While I have every confidence that the officials of the Commission and other governmental entities possessing similarly

plenary authority over any or all of their employees will at all times act in conformance with the public trust reposed in them, the danger that some might read the opinion of the Court as inferentially sanctioning conduct which to me would constitute an unconstitutional abuse of those broad powers compels me to add this word of caution lest we be so misconstrued.

SCHREIBER, J., dissenting. Today the Court[1] holds that a public employer, which has discharged an employee-at-will after investigation disclosed the employee's misconduct, must conduct a Fourteenth Amendment due process hearing to reconsider its decision. By unduly stretching the fabric of a civil service regulation, it manufactures a deprivation of "liberty" and concludes that the employee is entitled to a pretermination due process hearing though he may be discharged at will and without cause. It is obvious that this holding will create yet another procedural tool with which a litigious employee can frustrate a public employer's efforts to discharge him. When the State, as it has done here, affords a non-civil service employee an opportunity to participate with counsel in an inquiry into an incident that would provide fair ground for discharge, concludes that discharge is warranted and then effects the discharge with the utmost discretion, we should hesitate to invoke the concept of "liberty" as justification for requiring further proceedings. A weighing of both the public and private interests that are implicated

---

[1] The concurring opinion argues that Nicoletta could not be discharged except for cause and that the rehearing should be held to determine if cause exists. Under its analysis, judicial review would be available to prevent a discharge for an arbitrary or capricious reason. See Pashman, J., concurring, 77 *N. J.* at 182. The Chief Justice's opinion, on the other hand, holds that the purpose of the hearing before the North Jersey District Water Supply Commission is solely "to attempt to dislodge the specter of possible Civil Service debarment from further public employment" and that the Commission can exercise an apparently uncontrolled "basic discretion." *Id.* at 168.

in this case compels, in my view, the conclusion that plaintiff has received all the process that was due.

## I

Sergeant Nicholas Nicoletta and Police Officer Raymond Russomanno, who were both employed by the North Jersey District Water Supply Commission as officers of the Wanaque Reservoir Police Force, engaged in a physical altercation on March 20, 1974 at police headquarters. Both filed complaints with the Municipal Court of Wanaque Borough. The Commission suspended them indefinitely without pay on March 26, 1974 and proceeded to investigate the matter by holding a hearing on April 10, 1974.

A memorandum notice had been sent to Nicoletta, Russomanno and the Police Chief George Destito advising them to appear on that date "to confer on complaints and that you did not follow requests of Chief George Destito." Present at the meeting were the defendant and his attorney, and Russomanno and his attorney. Nicoletta was the first witness. After being sworn, he was initially questioned on direct examination by his attorney with respect to the incident on March 20 and its cause and then examined by the Commissioners and Commission counsel. Russomanno's testimony was then taken and the same procedure was followed.

Both parties were told that the Commission proposed to interrogate at a later date each person present at the time of the incident. Neither counsel requested to be in attendance at the interrogation. The Commission met again on April 16, 1974 and heard six police officers and the chief. The general investigative nature of the proceedings during both days is demonstrated by substantial questioning by the Commissioners on such matters as the instructions and training given to new police officers, training in handling of guns, and requests for constructive suggestions to improve the department.

The Commission formally convened on May 9, 1974. The minutes reflect that Nicoletta's counsel had requested that

his client be given permission to resign, and, after being advised that the Commission would accept a resignation and after consulting with Nicoletta, then reported that Nicoletta was unwilling to resign. Thereupon the Commission adopted a resolution which, without detailing the reasons, stated that the defendant's employment was terminated as of March 27, 1974 "for good cause shown."

On September 27, 1974, three-and-a-half months later, Nicoletta's counsel wrote to the Commission charging his removal was unlawful and demanding reinstatement with back pay. He asserted that Nicoletta had not received a complaint "specifying the charges against him, nor was he afforded a full and fair hearing on the charges." When the Commission refused to reinstate the defendant, this action was instituted. The relief sought was reinstatement, reimbursement with back pay and "such other relief as the court may deem just and proper." The Appellate Division initially remanded the matter to the Commission to make findings of fact. It was in response to that order that the Commission for the first time publicly detailed the factual findings in support of its conclusion of "good cause."

## II

Federal constitutional due process is triggered when a person is deprived of "property" or "liberty." *Board of Regents v. Roth*, 408 *U. S.* 564, 92 *S. Ct.* 2701, 33 *L. Ed.* 2d 548 (1972). As an employee of the North Jersey District Water Supply Commission in the capacity of an officer of the Wanaque Reservoir Police Force, Nicoletta was employed at will and was not subject to civil service. *N. J. S. A.* 58:5–6. He had no statutory or contractual entitlement to the job. Accordingly, he had no "property" interest in the employment. *Bishop v. Wood*, 426 *U. S.* 341, 96 *S. Ct.* 2074, 48 *L. Ed.* 2d 684 (1976); *Board of Regents v. Roth, supra; Sims v. Fox*, 505 *F.* 2d 857 (5th Cir. 1974), *cert.* den. 421 *U. S.* 1011, 95 *S. Ct.* 2415, 44 *L. Ed.* 2d 678 (1975). *Cf. Arnett*

*v. Kennedy,* 416 *U. S.* 134, 181, 94 *S. Ct.* 1633, 1657, 40 *L. Ed.* 2d 15, 48 (1974) (White, J., concurring in part) (employee who holds job at pleasure of employer has no "property interest").

Nor was his "liberty" interest impaired. The principles of *Bishop v. Wood, supra,* govern us here. There a policeman, whose employment was held to be at will and who was discharged without a hearing, instituted an action contending he had a constitutional right to a hearing. During pretrial discovery he was advised of the grounds for his dismissal. The Supreme Court rejected the argument that he was deprived of "liberty" in that the stigma of the discharge, the reasons being allegedly false, might severely damage his reputation in the community. Mr. Justice Stevens explained that:

> In Board of Regents v. Roth, 408 U. S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548, we recognized that the nonretention of an untenured college teacher might make him somewhat less attractive to other employers, but nevertheless concluded that it would stretch the concept too far "to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." Id., at 575, 92 S. Ct. 2701, 33 L. Ed. 2d 548. *This same conclusion applies to the discharge of a public employee whose position is terminable at the will of the employer when there is no public disclosure of the reasons for the discharge.*
>
> In this case the asserted reasons for the City Manager's decision were communicated orally to the petitioner in private and also were stated in writing in answer to interrogatories after this litigation commenced. Since the former communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his "good name, reputation, honor, or integrity" was thereby impaired. And since the latter communication was made in the course of a judicial proceeding which did not commence until after petitioner had suffered the injury for which he seeks redress, it surely cannot provide retroactive support for his claim. A contrary evaluation of either explanation would penalize forthright and truthful communication between employer and employee in the former instance, and between litigants in the latter. [*Id.* at 348–349, 96 *S. Ct.* at 2079, 48 *L. Ed.* 2d at 692 (emphasis supplied)]

The majority concedes that under *Bishop v. Wood* a public employee whose employment is terminable at will and

who is discharged is not deprived of "liberty" when no public disclosure of the reasons is made. See also *Gentile v. Walton*, 562 *F*. 2d 193 (2d Cir. 1977). Furthermore, subsequent disclosure of those reasons in a judicial proceeding cannot support a claim of "liberty" deprivation. This is so irrespective of the adverse impact on job opportunity. Mr. Justice Brennan in a dissenting opinion in *Bishop v. Wood* acknowledged this result. He said the majority held

that a State may tell an employee that he is being fired for some nonderogatory reason, and then turn around and inform prospective employers that the employee was in fact discharged for a stigmatizing reason that will effectively preclude future employment. [*Id*. at 351–352, 96 *S. Ct*. at 2081, 48 *L. Ed*. 2d at 694]

See "The Supreme Court 1975 Term," 90 *Harv. L. Rev*. 1, 101 (1976), which agrees with this analysis.

It is also possible to construe *Bishop v. Wood* to hold that, when the employee compels public disclosure of the reasons for the discharge, he cannot then complain of any resulting stigma. He cannot protest receipt of that which he sought, public disclosure of the grounds of the discharge. Although Nicoletta was given a hearing and police officer Bishop was not, in both cases there was no public disclosure of the reasons for the discharge. In both, the detailed factual bases were disclosed in the course of subsequent judicial proceedings, Nicoletta's in response to an order of the Appellate Division and Bishop's in answer to interrogatories. Nicoletta's status was identical to that of Bishop, a public employee whose position was terminable at will and who was entitled to a statement of reasons for his discharge.

Nicoletta's discharge, the majority alleges, exposes him "to potential disqualification from further public employment" which constitutes the deprivation of his constitutional liberty. This position relies exclusively upon a civil service regulation, *N. J. A. C*. 4:1–8.14. That regulation reads as follows:

(a) The Chief Examiner and Secretary shall take the following actions for any cause listed in subsection (b) of this Section or for any other good cause:

1. Reject the application of a person for admission to an examination;

2. Refuse to test an applicant;

3. Refuse to place the name of a person on the employment list;

4. Refuse to certify the name of an eligible person; or

5. Remove from the employment list the name of an eligible person.

(b) Any of the following shall constitute good cause for such action by the Chief Examiner and Secretary against any prospective employee who:

1. Lacks the established qualification requirements for the positions or employment for which he applies;

2. By law, is ineligible for appointment or employment in the position;

3. Is physically or mentally unfit to perform effectively the duties of the position;

4. Is addicted to the excessive use of drugs, narcotics or intoxicating beverages;

5. Has been convicted of any crime or other unlawful offense or has committed any act involving moral turpitude or infamous or disgraceful conduct;

6. Has been removed or has resigned not in good standing or has resigned in lieu of removal from the public service, or whose record of employment, public or private, has been unsatisfactory for any reason which casts substantial doubt upon the person's capacity to perform satisfactorily the duties of the position for which the application has been filed or the test held;

7. Has made a false statement of any material fact or attempted any deception or fraud in any Civil Service application, examination or in any information submitted to secure eligibility or appointment; or

8. Refuses to execute any oath prescribed by law.

(c) The Chief Examiner and Secretary may admit to an examination and subsequently, with the concurrence of the appointing authority, certify as eligible for employment any person who is ineligible under paragraphs 5, 6 and 7 of subsection (b) of this Section, but who has been rehabilitated to the extent that such employment would not be against the public interest. In accordance with N. J. S. A. 40A:14–122 and 40A:14–9 this exception shall not apply to police and fire positions, nor shall this exception extend to local government service situations when such exception is specifically precluded by law.

(d) No person suffering a physical defect due to injury incurred in the armed services shall be discriminated against because of such defect unless the Commission considers the defect incapacitating.

(e) The rejection of an application or other action against any person, under this rule, shall not be effective until the person is notified in writing of such action, together with the reasons therefor.

It must be observed that under subsection (b) 6 of the regulation, upon which the majority relies, removal from public service applies only to permanent employees in the classified civil service. Obviously, "removal from the public service" refers only to individuals who are governmental employees. The regulations define an "employee" as a person holding a position in the classified service. *N. J. A. C.* 4:1–2.1. Furthermore, the word "removal" means "separation from employment for cause." *N. J. A. C.* 4:1–2.1.

Reading subsection (b) 6 to refer to employees in the classified service who have been discharged for cause is consonant with the only regulation which expressly governs removal, *N. J. A. C.* 4:1–16.8(a).[2] This regulation, set forth verbatim in the footnote, identifies removal with permanent employees in the classified service and not with government employees having any other status. Provisional or temporary employees in classified service may be "terminated" at any time at the discretion of the appointing authority. *N. J. A. C.* 4:1–16.8(b). No reference is made to governmental

---

[2]This provision reads as follows:

4:1–16.8 *Removal*

(a) A permanent employee in the classified service may not be removed except for just cause upon written charges. Notice of the removal shall be sent to the employee on the form prescribed by the Civil Service Commission and a copy of said notice shall be sent to the Civil Service Department at the same time.

(b) A provisional or temporary employee may be terminated at any time at the discretion of the appointing authority. A provisional or temporary employee who has been terminated shall have no right of appeal to the Civil Service Commission.

employees who are not in the classified service. When consideration is then given to the various statutory provisions providing for dismissal of state civil service employees, *N. J. S. A.* 11:15–2, 11:15–3, 11:15–4, and 11:15–6,[3] it is clear that when the regulation refers to an individual who has been "removed * * * from the public service," reference is being made only to those who held classified civil service positions.

The all-embracing scope given to the regulation by the majority will disserve the interests of those government employees who are not in the classified service. They will now be subject to the disqualification of future employment upon discharge from their positions irrespective of the reasons for the discharge.

In the absence of that regulation, as I understand the majority opinion, Nicoletta would not be entitled to a "due process" hearing before the North Jersey District Water Supply Commission for reconsideration of his dismissal. The underlying assumption is that the civil service regulation triggers and causes impairment of Nicoletta's future job possibilities for public employment. Put another way, deprivation of Nicoletta's legitimate rights to apply and be certified for a civil service position stems from the promulgation of the civil service regulation.

As Mr. Justice Stewart stated in *Board of Regents v. Roth,* it is the *invocation* by the State of a regulation which would bar the individual from all other public employment which implicates the freedom to take advantage of other public employment. 408 *U. S.* at 573, 92 *S. Ct.* at 2707, 33 *L. Ed.* 2d at 559. Whether the civil service regulation is invalid as beyond statutory authority (see *N. J. S. A.* 11:

---

[3]Chapter 15 of the Civil Service Act is entitled "Suspension; Demotion; Removal." Each of the cited sections refers to "removal" of classified civil servants. Removal must be based on cause, *N. J. S. A.* 11:15–3, and is accompanied by procedural safeguards, including a hearing.

9–6) or as applied in any particular case are matters properly to be decided in a direct attack on the agency's regulation or upon appeal from its decision. The validity of regulation *N. J. A. C.* 4:1–8.14 and its future applications should not be treated as a diminishment of the North Jersey District Water Supply Commission's authority to discharge an at-will employee who is not in the classified civil service.

Several aspects of the Commission's regulation and its application bring into focus the fact that the defendant's discharge of Nicoletta has not affected his "liberty." First, although Nicoletta's discharge does not constitute a "removal," another clause in *N. J. A. C.* 4:1–8.14(b) 6 allows the Chief Examiner and Secretary of the Civil Service Commission to reject an applicant "whose record of employment, public or private, has been unsatisfactory for any reason which casts substantial doubt upon the person's capacity to perform satisfactorily the duties of the position for which the application has been filed * * *." Though the majority has not relied upon this provision, it might arguably bear on plaintiff's eligibility for some civil service positions. The effect of his unsatisfactory job performance would be the same even if his employment had been in the private sector. If he had been working for a private security guard company and had been discharged because of an unwarranted altercation, he would now be subject to the same disability. His right to apply for a civil service position is identical with that of any other person in the private sector, and his prior status as a public employee entitles him to no more. It is not the discharge from a state position in and of itself but rather the subsequent action of the Civil Service Commission which could be said to affect Nicoletta's liberty.

Second, the regulation provides not only that the employment prohibition may be relaxed, *N. J. A. C.* 4:1–8.14(c), but also that an aggrieved person has a right to review of an adverse ruling or determination of the Chief Examiner and Secretary. *N. J. A. C.* 4:1–8.15(a). Insofar as the proceedings before the Civil Service Commission are con-

cerned, he would be entitled to a hearing to demonstrate why he should not be disqualified. *Cunningham v. Department of Civil Service,* 69 *N. J.* 13 (1975). Furthermore, judicial review of its decision as a safeguard against any arbitrary or unreasonable action would be available. Thus, if an individual were discharged for an insignificant reason or one which is not related to performance of the prospective position, he would in all probability be entitled to take the civil service examination or be placed on the employment list.

Third, the speculative possibility that Nicoletta might apply for classified public employment and be rejected in the future does not establish a sufficiently grievous harm to constitute a deprivation of liberty. That this is so follows from recognition of the fact that discharge from any employment will almost always have some impact on prospective future employment. Yet such an effect has not been deemed sufficient to constitute an impairment of one's liberty. *Bishop v. Wood, supra.*

Under federal constitutional due process principles, Nicoletta, an at-will employee, was not entitled even to the hearing which he received. Public disclosure of the reasons for the discharge was made only in compliance with a court order, and therefore he was not entitled to a hearing to clear his name. Further, the thesis that Nicoletta's discharge *per se* forecloses his future public employment prospects is, as we have seen, based on the mistaken assumption that the term "removal" in the civil service regulation, *N. J. A. C.* 4:1–8.14, applies to non-civil service public employees-at-will. Finally, if the Civil Service Commission were to treat Nicoletta unjustly or unfairly in the future, his recourse against that body would be clear.

## III

The remedy projected by the majority is a "pretermination" hearing at which the employer may, *nunc pro tunc,* reconsider the firing. By holding that before an at-will em-

ployee may be discharged he is entitled to a specification of charges and a full due process evidentiary hearing, the majority elevates Nicoletta's status to at least that of a public employee who has a property right to his job. When a liberty interest is implicated, the only purpose of a hearing is to give the employee an opportunity to clear his name.

In *Codd v. Velger,* 429 *U. S.* 624, 97 *S. Ct.* 882, 51 *L. Ed.* 2d 92 (1977), a New York City policeman in a probationary status was discharged without a hearing. He asserted he had been entitled to a hearing due to the stigmatizing effect of certain material in his personnel file and his later dismissal from another position when that material was disclosed to his subsequent employer. The Supreme Court in denying the right to a hearing wrote:

> Assuming all of the other elements necessary to make out a claim of stigmatization under Roth and Bishop, the remedy mandated by the Due Process Clause of the Fourteenth Amendment is "an opportunity to refute the charge." 408 *U. S.* at 573, 92 *S. Ct.* 2701, 33 *L. Ed.* 2d 548. "The purpose of such notice and hearing is to provide the person an opportunity to clear his name," *id.,* at 573 n. 12.
>
> \* \* \* [T]he hearing required where a nontenured employee has been stigmatized in the course of a decision to terminate his employment is solely "to provide the person an opportunity to clear his name." [429 *U. S.* at 627, 97 *S. Ct.* at 884, 51 *L. Ed.* 2d at 96][4]

---

[4]The Court carefully distinguished nontenured employment from parole revocation, another instance raising liberty interest claims. It noted that in the latter case a hearing must address two distinct considerations — first, whether the parolee committed the violation with which he is charged, and second, whether if he did commit the act his parole should under the circumstances be revoked. The Court then stated that in the employment case "the contemplated hearing does not embrace any determination analogous to the 'second step' of the parole revocation proceeding, which would in effect be a determination of whether or not, conceding that the report were true, the employee was properly refused re-employment." 429 *U. S.* at 627–628, 97 *S. Ct.* at 884, 51 *L. Ed.* 2d at 96–97.

In *Arnett v. Kennedy, supra,* the Supreme Court held that a federal employee who could not be discharged absent cause was not entitled to an evidentiary hearing *before* suspension without pay. The Court also pointed out that when, as here,

[t]he purpose of the hearing * * * is to provide the person "an opportunity to clear his name," a hearing afforded by administrative appeal procedures *after the actual dismissal is a sufficient compliance with the requirements of the Due Process Clause.* [416 *U. S.* at 157, 94 *S. Ct.* at 1646, 40 *L. Ed.* 2d at 35 (emphasis supplied)]

*Williams v. Civil Service Commission,* 66 *N. J.* 152 (1974), upon which the majority relies, is consistent with *Codd v. Velger, supra.* There the purpose of the evidentiary post-termination hearing was "to clear any damage to his reputation" and not to compel the public employer to reconsider its decision.

To grant a pretermination constitutional due process hearing at which the employer must reconsider its action in discharging the employee is incompatible with the authority to discharge and will prove administratively unduly burdensome. After completion of an investigation, it now appears that a formal complaint and specification of charges will have to be drawn and served. Then a full hearing will have to be held which will probably necessitate the testimony again of all witnesses. There will then follow findings of fact and conclusions, presumably subject to judicial review, all of which will serve no useful function in view of the small probability that the employer will change its mind and the broad discretionary authority to discharge without cause. *Cf. Jeffries v. Turkey Run Consolidated School District,* 492 *F.* 2d 1 (7th Cir. 1974) (untenured teacher not constitutionally protected against arbitrary discharge). The holding today will enable every employee-at-will to demand a pretermination hearing merely by alleging that a proposed discharge will adversely affect employment opportunities.

## IV

The New Jersey Constitution does not require a contrary result. Although Article I, par. 1 affirms the right to enjoy "liberty," it is well settled that, in the absence of a contract, statute or violation of an individual's exercise of a constitutional right,[5] an at-will employee may be discharged for any reason.[6] In *Zimmerman v. Bd. of Ed. of Newark,* 38 *N. J.* 65 (1962), *cert.* den. 371 *U. S.* 956, 83 *S. Ct.* 508, 9 *L. Ed.* 2d 502 (1963), we said the governmental employing unit may exercise the right "as it sees fit" to discharge such an employee. 38 *N. J.* at 71. We recognized the same principle recently in *English v. College of Medicine and Dentistry of N. J.,* 73 *N. J.* 20, 23 (1977), in which we reiterated that a discharge of an at-will employee need not be for just cause.

In Chief Justice Weintraub's concurring opinion in *Zimmerman v. Bd. of Ed. of Newark, supra,* he raised, without deciding, the question whether the governmental employee could be discharged for any reason or no reason. 38 *N. J.* at 80. A corollary to this question arose in *Donaldson v. Bd. of Ed. of No. Wildwood,* 65 *N. J.* 236 (1974), where Justice Jacobs held for a majority of the Court that the failure to state the reasons for refusal to rehire a non-tenure teacher was arbitrary and, as a matter of elemental fairness, a statement of reasons must be given. *Id.* at 245. He assumed that there was no federal constitutional right to a statement of reasons (unless the discharge was predicated on an impermissible constitutional ground). He placed substantial re-

---

[5]See *Winston v. Bd. of Ed. of So. Plainfield,* 64 *N. J.* 582 (1974) and cases cited therein at 587. See also *Perry v. Sindermann,* 408 *U. S.* 593, 598, 92 *S. Ct.* 2694, 2698, 33 *L. Ed.* 2d 570, 578 (1972) ; *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 *U. S.* 274, 97 *S. Ct.* 568, 50 *L. Ed.* 2d 471 (1977).

[6]I understand the plurality agrees with this proposition, holding that "termination need not be predicated on just cause * * *," 77 *N. J.* at 154, and that the Commission has an "uncontrolled discretion" in deciding to discharge an at-will employee. *Id.* at 168–169.

liance upon *Monks v. N. J. State Parole Board,* 58 *N. J.* 238 (1971), a case holding that a prisoner is entitled to a statement of reasons in connection with denial of his parole application as a matter of basic fairness. However, there the Legislature had provided for parole if "there is reasonable probability" that the prisoner will assume his proper place in society. 58 *N. J.* at 242–243. Further, the nature of the interest, the right to be released from prison, involved an outright deprivation of "liberty." In *Donaldson* Justice Jacobs, unquestionably recognizing these differences, referred to the constitutional authority to review administrative actions and the necessity of administrative agencies to particularize their findings to prevent arbitrary action. 65 *N. J.* at 243–244. His conclusions were bottomed on the findings that *on request* a teacher should be given the reasons for nonretention because of the value of constructive criticism to the teacher, and, incidentally, that the statement could serve as a "discipline on the board itself against arbitrary or abusive exercise of its discretionary powers." *Id.* at 245. *Donaldson* does *not* hold that the reasons for nonretention must constitute just cause. There is no inconsistency between the need to state the reasons upon request for a nonretention or discharge of an at-will employee and the power to exercise the discretion to terminate the employee status.

When, of course, the discharged employee demands the particulars, then he cannot complain about the stigma or its impact on future employment opportunities. It is clear that disclosures of the grounds of plaintiff's discharge were compelled by his litigation. Furthermore, if the employing unit is forced to state the reasons because of judicial fiat, no sound basis justifies a different result. The extension of the *Donaldson* doctrine to require a hearing accompanied with the full panoply of constitutional due process rights is not warranted.

## V

The majority contends that the notice of the hearing did not satisfy due process requirements, but the notice was not intended to serve that purpose. The Commission's notice of the hearing referred to a conference on "complaints" and the failure to "follow requests of Chief George Destito." It must be remembered that at this stage the Commission was only conducting an investigation. It could not reasonably have been required to set forth specific charges against both Nicoletta and Russomanno. When its letter went out notifying them of a hearing on April 10, 1974, the Commission was not prepared to make charges against either man.

Furthermore, Nicoletta sustained no prejudice procedurally in any manner and he asserts none. It is self-evident from the record that he knew precisely why the meeting was called. Nicoletta testified first under the direction of his attorney. The direct examination covered the important misconduct issues. No objections were made to any questions throughout the proceedings on the basis that they were beyond the scope of the noticed subject matter or on any other ground. Though advised that other witnesses to the fracas would be called at a later time, he did not object and he made no request to be present. When asked whether anyone else should be called, he suggested the names of five witnesses. Four of these testified. Neither Nicoletta nor his counsel ever asserted that the notice was inadequate, that they desired to be present at the second meeting, or that they might desire to cross-examine each witness, a most unlikely event since Russomanno had not been asked one question on cross-examination.

A review of the record discloses that Nicoletta had been angered at Russomanno for repeating a charge Nicoletta had made about another officer, Scheuer, to Scheuer. When Nicoletta, who was coming off his shift at 7:00 A.M. on March 19, 1974, encountered Russomanno at headquarters, he twice attacked Russomanno, threatened to kill him, and twice had

to be forcibly pulled off him. Nicoletta then directed those present not to report the incident. After Russomanno filed a criminal complaint in the Borough of Wanaque, Nicoletta on the advice of his counsel, who believed it was an appropriate protective measure, filed a counter complaint. Six witnesses independently agreed that Nicoletta was the aggressor. Several heard his threat to Russomanno that "I'll kill you." Nicoletta did not deny that he was the aggressor, admitted that he was on top of Russomanno and was pulled away, did not deny making the threat, and did not dispute the fact that he had instructed those present not to report the affair. All agreed that the police force morale had improved after Nicoletta's suspension. During the course of the hearing Nicoletta complained that neither the Chief of Police nor the officers had any respect for him. He conceded that he had had frequent problems with the Chief and other officers in the 14 months he had been employed on the force. The evidence is so overwhelming in support of the Commission's actions, it is difficult to comprehend how Nicoletta suffered any harm. Certainly, it cannot be contended that the Commission's action was arbitrary or capricious.

## VI

Neither constitutional due process nor fundamental fairness required more than affording Nicoletta the opportunity to explain what had occurred. He had no federal or state constitutional right to a hearing. At most he was entitled. at his request, to a statement of the reasons for his discharge, and compliance with that request did not entitle him to a due process hearing. What Nicoletta seeks is reinstatement and back pay, not another hearing with a parade of witnesses to reiterate the facts underlying the discharge. To require a pretermination constitutional due process hearing under these circumstances, where the Commission had the conceded right to discharge with or without cause, can serve no useful purpose.

I would affirm.

Justice SULLIVAN and Justice CLIFFORD join in this opinion.

*For reversal*—Chief Justice HUGHES and Justices MOUNTAIN, PASHMAN and HANDLER—4.

*For affirmance*—Justices SULLIVAN, CLIFFORD and SCHREIBER—3.